233 N.J. Super. 356 (1989)
558 A.2d 1357
IN THE MATTER OF ROY SAVAGE.
Superior Court of New Jersey, Appellate Division.
Argued January 23, 1989.
Decided May 30, 1989.
*358 Before Judges J.H. COLEMAN, BAIME and D'ANNUNZIO.
M. Virginia Barta, Assistant Deputy Public Defender, argued the cause for appellant (Alfred A. Slocum, Public Defender, attorney; M. Virginia Barta, on the brief).
Barry Fulmer, Deputy Attorney General, argued the cause for respondent (Donald R. Belsole, Acting Attorney General, attorney; Barry Fulmer, on the brief).
The opinion of the court was delivered by D'ANNUNZIO, J.A.D.
Roy Savage, currently under a 1985 death sentence for murder and assigned to Trenton State Prison's Capital Sentence Unit (CSU), see N.J.S.A. 2C:49-6, appeals from a judgment committing him to "the Department of Human Services" (DHS) and authorizing his treatment with anti-psychotic medication "as the physician deems medically appropriate." The judgment also authorized Savage's continued incarceration at CSU without a physical transfer to a DHS facility.
The material substantive and procedural facts are not in dispute. On June 30, 1988, the State applied to the Chancery Division for an order permitting it to treat Savage with anti-psychotic medication.[1] Judge Levy denied the application but ordered Savage to show cause why the State should be precluded *359 from administering the medication to him. On the original return date of the Order to Show Cause Judge Levy scheduled a plenary hearing. At the plenary hearing medical professionals testified on behalf of both parties. Savage also testified. Judge Levy found that Savage was mentally ill and actively psychotic, a fact conceded by Savage's psychiatrist. He also found that Savage was dangerous to himself and to others and, therefore, entered the judgment at issue.
The trial judge relied on N.J.S.A. 30:4-82 (repealed effective November 7, 1988 by L. 1987, c. 116, § 30) which authorized the Superior Court to direct the removal of a mentally ill inmate from a prison to "one of the institutions for the care and treatment of [the mentally ill] owned by this State...." However, in lieu of an actual physical transfer to a hospital for the mentally ill, the court effected a constructive transfer to DHS pursuant to an agreement between DHS and the Department of Corrections (DOC) regarding treatment of CSU inmates. The agreement, a copy of which is made a part of this opinion as Appendix A, continues the inmate's physical custody in the CSU.
Appellant contends that the trial court improperly applied the dangerousness standard and that its finding that he is a danger to himself or others is not supported by clear and convincing evidence.
Appellant's mental illness is conceded. We assume without deciding that the State had the burden of establishing appellant's dangerousness by clear and convincing evidence rather than by a mere preponderance of the evidence. Addington v. Texas, 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979); Matter of Newsome, 176 N.J. Super. 511 (App.Div. 1980). But cf. Jones v. United States, 463 U.S. 354, 103 S.Ct. 3043, 77 L.Ed.2d 694 (1983) (person found not guilty by reason of insanity could be committed upon establishing mental illness and dangerousness by a preponderance of the evidence); In re A.L.U., 192 N.J. Super. 480 (App.Div. 1984) (applied the preponderance *360 standard to a committee previously acquitted by reason of insanity), certif. den., 97 N.J. 589 (1984). We have carefully reviewed the record, and we conclude that the evidence supported the trial court's finding.
Dr. Parrish testified for the State. He had been a staff psychologist at Trenton State Prison for ten years, the last two years as Director of Psychology. Dr. Parrish had been observing Savage since August 1987, he had interviewed him on at least three occasions within two months of the plenary hearing and had reviewed other medical professionals' reports regarding Savage. Dr. Parrish testified that in his opinion there was a substantial risk that Savage would harm himself or others. He explained that in evaluating dangerousness, certain factors are considered, all of which were present in Savage's case. They are depression and helplessness; defective judgment; stress; little or no contact with supportive individuals such as family members; prior resort to violence; and withdrawal, i.e., a tendency not to communicate. Dr. Parrish testified, based on his assessment of inmates over the years, that these factors are "red flags" that indicate a high risk of assault, suicide or homicide.
Dr. Garcia, staff psychiatrist at Trenton State Prison for six years, also testified. He had examined Savage more than 20 times since August 1987. According to Dr. Garcia, Savage has a "severe paranoid disorder," with a poor prognosis, and will gradually deteriorate without medication. Dr. Garcia rated the risk of Savage being harmful to himself or to others as a "very serious, very high risk." Dr. Garcia also testified that without anti-psychotic medication, Savage would "get worse, and sooner or later, it's going to happen. He's going to hurt himself or another." Dr. Garcia characterized prior violence as an important predictor of violence, and he rated Savage's potential to commit a future act of violence as "[a] hundred percent, 95, 99 percent potential for violence."
*361 Dr. Greenfield testified in Savage's behalf. Although he agreed that Savage was psychotic, he testified that "based on his overt actions ... he is not dangerous to himself." With regard to Savage as a threat to others, Dr. Greenfield stated: "I don't believe he has the opportunity to be dangerous to others." Dr. Greenfield did believe that Savage would benefit from medication and would improve over a period of time.
The testimony of Drs. Parrish and Garcia, which was credited by the trial court, established a "substantial risk of dangerous conduct within the reasonably foreseeable future." State v. Krol, 68 N.J. 236, 260 (1975). Krol also recognized the probative value of past conduct on the issue of dangerousness:
Determination of dangerousness involves prediction of defendant's future conduct rather than mere characterization of his past conduct. Nonetheless, defendant's past conduct is important evidence as to his probable future conduct.... [Id. at 260-261].
Defendant's past conduct includes the homicide which resulted in his death sentence.[2]Accord State v. Fields, 77 N.J. 282, 308-309 (1978).
The trial judge's findings and conclusions are supported by substantial credible evidence in the record, Rova Farms Resort v. Investors Ins. Co., 65 N.J. 474, 484 (1974), and we perceive no violation of any applicable legal standard. State v. Krol, *362 supra; N.J.S.A. 30:4-27.2(i)[3]; R. 4:74-7(f). Thus, Savage was commitable and subject to transfer under N.J.S.A. 30:4-82 from a correctional institution to an institution for the care and treatment of the mentally ill. Moreover, the trial judge scrupulously respected Savage's Fourteenth Amendment due process rights. See Vitek v. Jones, 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980).
As previously indicated, Judge Levy committed Savage to DHS' care, but he ordered that "no actual physical transfer of inmate Savage to a [DHS] facility shall take place." Thus, Judge Levy effected a constructive transfer to DHS consistent with the agreement between DHS and DOC regarding CSU inmates in need of psychiatric care. N.J.S.A. 30:4-82.1 et seq. authorizes such agreements. The agreement and the constructive transfer implied therein and utilized in this case harmonize CSU security needs, see N.J.S.A. 2C:49-6 and N.J.A.C. 10A:5-4.1 et seq., with the inmate's treatment requirements. Consequently, we find no merit to Savage's contention that he must be physically transferred "to a mental hospital for psychiatric treatment." The record does not support a finding of undue prejudice to Savage flowing from his continuing status as a CSU inmate, or prejudice which would outweigh the State's security interest as expressed in N.J.S.A. 2C:49-6.
Savage also contends that "the DOC/DHS agreement provides neither the full procedural and substantive due process protections to which persons are entitled prior to commitment to a mental institution...." The contention is meritless. Savage was committed after a plenary hearing, on notice, at which *363 he was represented by counsel, testified and presented other evidence in his behalf. His commitment was based on a finding that he was mentally ill (not controverted) and dangerous. Savage's commitment was not based on the DOC/DHS agreement.
We agree with Savage's contention that the commitment order was deficient because it did not include provisions for the periodic review of Savage's commitment required by R. 4:74-7(f). See State v. Fields, 77 N.J. 282 (1978). However, we do not agree that Savage is entitled to the full range of rights available to an involuntary committee, as he contends. See N.J.S.A. 30:4-24.1 et seq. Savage's situation is unique because he is under a death sentence. Consequently, rights which interfere with the special legislatively mandated security status of capital inmates would be inappropriate. Similarly, a long-term treatment program and vocational training are inconsistent with the capital inmate's unique status and would consume scarce treatment resources.
We do agree that a Rennie Advocate should be assigned to Savage as required by DHS Administrative Bulletin 78-3, Sections III and IVC.2(e). Periodic court review of the need for continued commitment and oversight by the Rennie Advocate will protect inmates from the inappropriate use of psychotropic medication.
The judgment, as modified, is affirmed, and the matter is remanded to the Chancery Division for entry of an amended judgment which shall provide for periodic review and appointment of a Rennie advocate.

APPENDIX A
AGREEMENT effective as of the date recorded on the signature page between the signatory departments.
*364 WHEREAS the New Jersey State Prison (NJSP) Capital Sentences Unit (CSU) houses "death row" inmates, some of whom may experience psychiatric crisis (i.e., psychosis) and resistance to treatment that under other circumstances would require acute hospitalization for psychiatric stabilization, and due to the prohibitive requirement for security, transfer to a psychiatric facility is unfeasible: and
WHEREAS The Department of Human Services (DHS) agrees to arrange for the provision of direct psychiatric services to inmates at the CSU who are suffering from serious mental illness and would otherwise be "commitable" to the Forensic Psychiatric Hospital (FPH).
THEREFORE this procedure has been developed to meet the inmate's right to treatment, without jeopardizing the maximum security nature of the inmate's status, and the Departments agree as follows:

I. DEFINITIONS
For the purposes of this document, the following terms, when capitalized, shall have meanings as stated:

Agreements means this document, the Annex(es), any additional appendices or attachments (including any approved assignments, subcontracts or modifications) and all supporting documents. The Agreement constitutes the entire agreement between the parties. Any change or modification to this Agreement must be written and approved in writing by both Departments.

Consultant Psychiatrist means an appropriately credentialled Psychiatrist, to be identified by DHS as willing to contract with the Departments to provide psychiatric services for Capital Sentencing Unit inmates under the terms of this agreement.

Notice means an official written communication between the Departments. All Notices shall be delivered in person or by certified mail, return receipt requested, and shall be directed to the persons and addresses specified for such purpose in the Annex(es) or to such other persons as either party may designate in writing.

Termination means an official cessation of this Agreement, resulting from routine expiration or from action taken by either Department, in accordance with provisions contained in this Agreement, to nullify the Agreement prior to term.

*365 II. BASIC OBLIGATIONS OF THE DEPARTMENT OF CORRECTIONS

Section 2.0 CSU Procedures: The following procedures are currently in effect for NJSP staff in providing psychological/psychiatric intervention for inmates housed on the Capital Sentence Unit, and shall be continued.
Monitoring Process
1. All CSU inmates are monitored on a weekly basis by one of the NJSP Psychology Department staff assigned to cover the unit. Each inmate is observed in his or her cell, and is briefly interviewed to determine whether there are any changes in mental status that may require further professional intervention. A roster/check list is used to record this monitoring process, and is filed in the Administrator's file, the inmate's classification file, and in the Psychology Department files.
2. Every fourth week the staff psychiatrist interviews each inmate on the unit and dictates a brief evaluation for transcription. These evaluations are maintained in the inmate's classification file.
3. All inmates on the CSU unit are on "close watch", given the nature of their sentence. All custody personnel are instructed to report any unusual behavior, changes in behavior, or requests to see a psychologist or psychiatrist.

Intervention Process:
In the event that there appears to be a need for further psychiatric evaluation/intervention for a CSU inmate, the following process is effected:
4. The staff psychiatrist and an assigned staff psychologist meet with the identified inmate on the unit. This meeting involves an indepth interview to determine the nature and seriousness of the mental illness.
5. Following the interview the Psychology Department CSU staff meet to review the inmate's history and current mental status. This consultation may result in a diagnosis and a plan for further intervention or treatment, if appropriate.
6. The above interview and consultation is documented and distributed to the Administrator(s) designated to monitor the operation of the unit, and placed in the inmate's classification file, as well as the CSU file maintained in the Psychology Department.

III. BASIC JOINT OBLIGATIONS OF DOC AND DHS (DMH & H)

Section 3.0 CSU/DMH & H Procedures (limited to CSU inmates who are determined to be psychotic and due to that psychosis present a probable danger to self and/or others and/or property, thereby meeting the commitment criteria for psychiatric hospitalization):
This language complies with the New Jersey Court rules on Civil Commitment (R.4:74-7).
*366 1. Following the CSU evaluation, detailed in Section 2.0 CSU Procedures, the New Jersey State Prison staff will make every effort to treat such patients on a voluntary basis.
2. The Forensic Psychiatric Hospital staff are available for consultation and technical assistance in patient assessment and in encouraging voluntary treatment.
3. DMH & H, in conjunction with the Forensic Psychiatric Hospital, will arrange a list of appropriately credentialled Consultant Psychiatrists to be available under contract to provide additional necessary assessment and treatment services at New Jersey State Prison.
4. When the New Jersey State Prison psychiatric staff determine that an inmate of the CSU is unwilling or unable to provide voluntary consent for psychiatric treatment, the New Jersey State Prison Director of Psychiatry/Psychology will contact a Consultant Psychiatrist from the Division's list and schedule an immediate visit.
5. If the inmate refuses medication, the Consulting Psychiatrist will prepare a written assessment of the inmate's clinical condition and prescribed course of treatment in order to pursue appropriate judicial action to facilitate needed treatment. All treatment services will be provided to the inmate at New Jersey State Prison without transfer to the Forensic Psychiatric Hospital.
6. DMH & H would cover any extraordinary services that the Consulting Psychiatrist prescribes for the inmate/patient on the CSU, including extraordinary psychological counseling, nursing, or laboratory services.
7. New Jersey State Prison will provide routine auxiliary services for the Consulting Psychiatrist. These include routine medications administration, security monitoring (i.e., close watch), laboratory work, psychological counseling, blood work, and correction officer assistance in securing injections, if needed.
8. Based on his review and concurrence, the New Jersey State Prison psychiatrist will provide the necessary second signature for judicial action.
9. The New Jersey State Prison administration will forward the appropriate documentation to the Attorney General's office for judicial action. Upon approval of the court or an authorized guardian, treatment by the Consulting Psychiatrist can begin immediately.
10. If the judicial process has been invoked in order to obtain necessary treatment for an inmate, and if during treatment the inmate has been restored to psychological ability to accept the need for treatment, and accepts said necessary treatment, the inmate may convert to a voluntary treatment status. In such cases continued treatment will be assumed by the New Jersey State Prison staff.
11. Following a court order, there may be a rare instance in which an inmate needs to be restrained in order to have medication administered. In such instances, the Department of Correction correctional officers will follow their same procedures now in practice for inmates treated at St. Francis Medical Center and provide the necessary restraint. However, every effort should be *367 made in order to encourage the inmate to accept the medication without physical intervention.
12. The criteria for terminating the services of the Consulting Psychiatrist under contract to DMH & H are the same as the discharge criteria from the Forensic Psychiatric Hospital for returning an inmate to New Jersey State Prison. Once the inmate is medically stablized on medication, the Consulting Psychiatrist should write a "discharge summary" and return the medical responsibility to the New Jersey State Prison medical staff.
13. In the event of a question or disagreement about the inmate/patient's condition, the Forensic Psychiatric Hospital medical director should be contacted for review and disposition of the case. In the event of a continuing disagreement, the Division's Chief Psychiatric Consultant has final authority for disposition of such treatment.

IV. PAYMENT

Section 4.0 Payments: DHS will fund the program which provides for the Consulting Psychiatrist and extraordinary mental health services as described in Sections 3.03-3.05.
V. TERMINATION

Section 5.01 Termination: Either or both Departments may terminate this Agreement upon 30 calendar days advance written notice to the other party. The Departments recognize, however, that pursuant to N.J.S.A. 30:4-82 they must continue to formulate a plan to provide adequate and appropriate mental health services to inmates.

Section 5.02 Reduction or Termination Due to Fiscal Constraints: Anything to the contrary in this Agreement notwithstanding, the parties recognize and agree that their ability to honor the terms and conditions of this Agreement is contingent upon receipt of appropriations of the State Legislature. If during the terms of this Agreement, therefore, the State government reduces its allocation to the Division and/or Agency, both parties reserve the right, upon notice to the other party, to reduce or terminate the Agreement.

VI. MISCELLANEOUS

Section 6.01 Application of New Jersey Law: This Agreement shall be governed, construed, and interpreted in accordance with the laws of the State of New Jersey.

Section 6.02 Exercise of Rights: A failure or a delay on the part of the Division or the Agency in exercising any right, power or privilege under this Agreement shall not waive that right, power or privilege. Moreover, a single or a partial exercise shall not prevent another or a further exercise of that or of any other right, power or privilege.
NOTES
[1] For a summary of the benefits and side-effects of anti-psychotic medication see the first trial court opinion in Rennie v. Klein, 462 F. Supp. 1131 (D.N.J. 1978) and 476 F. Supp. 1294 (D.N.J. 1979), affirmed and modified, 653 F.2d 836 (3d Cir.1981) (en banc), remanded 458 U.S. 1119, 102 S.Ct. 3506, 73 L.Ed.2d 1381 (1982), reconsidered and modified in light of Youngberg v. Romeo, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 at 720 F.2d 266 (3d Cir.1983) (en banc).
[2] Savage is under a death sentence for the murder of Carolyn Hubbard. His appeal is pending in the New Jersey Supreme Court, Dkt 30,000-126. The State's Supreme Court brief contains this description of the discovery and condition of Hubbard's body:

On Monday, September 12, 1983, two porters at Columbus Homes in Newark, New Jersey were called to remove a smelly suitcase from the twelfth floor of the building located at 6 Sheffield Drive. When they threw the suitcase into the dumpster, it opened to reveal a human torso. The torso was that of a black female and was missing the head, hands, part of the thighs and the legs. A finger was also found in the suitcase. There was no evidence of any trauma or injury to the torso except for three abrasions: one three and one-half inches long on the outer right shoulder; one two inches long under the right arm on the chest wall; and one from the right side chest wall extending to the lower back [transcript citations omitted.]
[3] This section of the act revising civil commitment procedures and standards provides:

i. "Dangerous to others or property" means that by reason of mental illness there is a substantial likelihood that the person will inflict serious bodily harm upon another person or cause serious property damage within the reasonably foreseeable future. This determination shall take into account a person's history, recent behavior and any recent act or threat.