577 A.2d 455

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v. ROY
SAVAGE, DEFENDANT–APPELLANT.

Argued November 6, 1989—Decided July 19, 1990.

*M. Virginia Barta* and *Robert Seelenfreund,* Assistant Deputy Public Defenders, argued the cause for appellant. (*Alfred A. Slocum,* Public Defender, attorney).

*Robin Parker,* Deputy Attorney General, argued the cause for respondent (*Peter N. Perretti, Jr.,* Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

GARIBALDI, J.

A jury convicted defendant, Roy Savage, of the capital murder of Carolyn Hubbard and sentenced him to death. He appealed as of right. *R.* 2:2–1(a)(3). We find that defendant was denied effective assistance of counsel, in violation of the federal and state constitutions, and therefore reverse his murder conviction [1] and sentence of death. Consequently, we remand the case to the law division for a new trial.

In addition, we consider whether under our state constitution a defendant has a constitutional right to testify at trial and whether a trial court has the corollary duty to advise a defendant of that right. We also address certain collateral issues raised by defendant—many of which were resolved by our decisions in *State v. Biegenwald,* 106 *N.J.* 13, 524 *A.*2d 130 (1987), and *State v. Ramseur,* 106 *N.J.* 123, 524 *A.*2d 188 (1987)—that may arise in the event of a retrial.

I

*Facts*

A. *The Discovery of the Torso, the Investigation, and the Arrest*

---

[1]Defendant also was convicted of hindering his own apprehension in violation of *N.J.S.A.* 2C:29–3. The trial court merged that conviction into the murder conviction.

On Thursday, September 8, 1983, Margie King Guest, a seventh-floor resident of the Columbus Homes Project in Newark, ("Projects") was leaving her building to meet a girlfriend. On arriving in the lobby, she noticed an "awful" odor, and a man with a large suitcase. The odor was so strong that she covered her mouth and ran to her friend's apartment. A few minutes later, she saw the man she had seen in the lobby with the suitcase leave the building. She noticed that he wore glasses and a muslim cap and that he had a cloth around his arm, using it as a sling. He walked past her, and entered a small blue car driven by another male, accompanied by a female wearing a veil over her face. The car turned around and drove away.

The next night, Friday, September 9, 1983, Aleida Bonilla and Felix Figueroa, residents of the Projects, were in the lobby of their building awaiting the elevator when they detected a foul odor. It forced them outside for air. After they returned to the lobby, the elevator door opened and they saw a man inside with an approximately four-to-five feet wide by three-and-one-half feet high suitcase at his right-hand side. They described the suitcase as blue with a brownish substance underneath. Mr. Figueroa wrapped his scarf around his face and held his breath all the way to the ninth floor to escape the odor apparently emanating from the suitcase. Ms. Bonilla noticed that the man was wearing glasses and had a towel with what appeared to be dry blood wrapped around his hands. Ms. Bonilla and Mr. Figueroa left the elevator on the ninth floor; the man with the suitcase stayed on.

That same night, Douglas Robinson, another tenant of the Projects, saw a strange man standing in his hallway carrying a blue suitcase with red stains underneath. He noticed that the man wore a pair of tinted glasses. Mr. Robinson also noticed a "terrible smell" emanating from the suitcase. When he left his apartment about five minutes later, he saw the strange man standing near the back step close to the garbage dumpster.

The odor pervaded the hallways of the Projects during the week-end and even reached some apartments. On Monday, September 12, 1983, Augustine Arana, a porter at the Projects, was asked to investigate an odor on the twelfth floor. Arana found a large blue suitcase in the hallway, and with the help of another man carried it outside to the dumpster. When the porters threw the suitcase into the dumpster, it opened to reveal the headless torso of a black woman; the hands were missing, and the legs had been severed and were missing from below the mid-thigh. A single finger was later found in the suitcase. Aleida Bonilla, Felix Figueroa, Douglas Robinson and Margie King Guest later identified the man with the suitcase as defendant, Roy Savage.

The investigation triggered by the events at the Projects revealed that Roy Savage's appearance there with the large blue suitcase was but the last of a series of bizarre appearances by him that week in the Newark and New York City metropolitan areas. On Labor Day, Monday, September 5, 1983, Eugene Charles, the Engineer Superintendent at the Pavilion Apartments in Newark, saw a "Muslim woman" and a "man with a suitcase" get into a small car with New York license plates.

Defendant also resided periodically at Apartment 12A, 37 W. 138th Street, in New York City. Several neighbors of the West 138th Street apartment also saw defendant that week. On or about September 9, 1983, Margaret Cooper, who lived next door to Savage on the fourth floor, spotted him standing naked in the street. Ms. Cooper also noticed an unusual smell emanating from the apartment next door that pervaded her apartment as well as the common areas.

A subsequent investigation revealed that Roy Savage had been taken on September 9, 1983, to Harlem Hospital. When hospital security saw him in the lobby of Harlem Hospital dressed in a paper gown, Savage ran out of the hospital lobby in the direction of 138th Street. During the chase, Savage's

gown came off, and he continued running nude through the streets with an IV bottle and tube attached to his arm.

During that week, Emma Hubbard, a neighbor at 37 W. 138th Street, was standing on the stoop in front of the building, when she saw Roy Savage, luggage in hand and fully dressed, leave the building. She, too, noticed an unusual odor emanating from the suitcase as he passed.

Christopher Gadson, the superintendent of the building at 37 W. 138th Street, received complaints from residents regarding a terrible odor. Gadson noticed a strong, foul, odor and saw a trail of fluid leading from the fourth floor, where Savage often stayed with the Muslim women, down the stairs and into the street.

On Saturday, September 10, 1983, New York City Police executed a search warrant at the 37 W. 138th Street apartment. They found the apartment in "disarray," and pervaded by the odor of decaying flesh. There were blood splatterings around the apartment and a pool of blood on the floor of a closet near the kitchen.

One week later, on September 17, 1983, Newark police executed a search warrant at apartment # 305, 351 Broad Street, the apartment occupied by Roy Savage and several Muslim women and children. When police knocked, a woman who identified herself as Cheryl Hubbard opened the door. At that point, according to police, Roy Savage, who was in the apartment when the police arrived, indicated that he knew about the suitcase. The police then read Savage his *Miranda* rights, and took Savage and Cheryl Hubbard to the police station for questioning.

At the station, Savage gave the police a written statement. He gave his full name as Roy D. Savage but indicated that he also answered to Hashim Abdul Muhammed. He gave his main address as 273 W. 131st Street in New York, but stated that he often stayed at 351 Broad Street in Newark with Carolyn Hubbard, her sister Cheryl Hubbard, and Tammy Cherry, de-

scribed by Savage as his "companions" or "associates." All were adherents of the Muslim faith and members of the Muslim Ansaaru sect. Savage lived with his legal wife, Fay Vonder Savage, and his two children at the W. 131st Street address; he also admitted that he had sometimes stayed at 37 W. 138th Street with another Muslim woman, Jackie Cobb.

In his September 17, 1983, statement defendant contended that while waiting for a bus on Thursday, September 8, he was hit from behind and knocked unconscious, and that he awoke the next day in Harlem Hospital. A black girl with long braids came to his bedside, told him to go to the apartment on 138th Street and move the suitcase to New Jersey. She threatened to kill him if he did not comply. He related that she placed a pistol at his head, pulled the trigger on a blank, and told him: "They could have killed you a long time ago, don't think that we are joking now." Savage then described how he immediately ran out of the hospital, dressed only in his hospital gown, chased by security guards until he reached the 138th Street address. After dressing, he went to the 131st Street address, and then returned to 138th Street with Fay Vonder and Carl Gamble to pick up the blue suitcase. Driving in Gamble's grey Toyota, the three took the suitcase to the Projects, and left it on the twelfth floor. Savage related that he did not know the contents of the suitcase at that time, and took it to Newark because he had been instructed to do so by the girl with the gun. He made the statement "because I am trying to protect my people who are in danger (because) the girl with the gun stated that she could have killed me already."

Cheryl Hubbard gave a statement to the police on September 20, 1983. In her statement—the first of four, including her trial testimony, that Ms. Hubbard was to give—Ms. Hubbard identified Roy Savage as the father of her two youngest children and as her "mate." According to Cheryl Hubbard, Savage had four other "mates": Carolyn Hubbard, Cheryl's sister; Jackie Cobb; Tammy Cherry; and Fay Vonder Savage. Cheryl Hubbard stated that she had last seen her sister Carolyn

on the morning of September 4, 1983, sweeping the floor in the 351 Broad Street apartment. Cheryl had left to go to the store, and when she returned, Roy sent her to the Lincoln Motel with her two children. According to her statement, Cheryl stayed at the Lincoln Motel until Monday, September 5, when she returned to 351· Broad Street. She admitted that when she returned, there was a foul odor in the apartment. She also recalled seeing Roy and Fay Vonder Savage in the apartment that week, but denied seeing a suitcase.

On September 26, 1983, Cheryl Hubbard gave a second statement. In that statement, she admitted seeing a brown suitcase, leaking a dark brown liquid, in the 351 Broad Street apartment during the week following her return from the Lincoln Motel. That week, she also observed Roy painting over a brown stained spot on the wall of their apartment.

Nearly a year later, on August 23, 1984, after Cheryl Hubbard had been indicted for hindering apprehension and had entered a Pre–Trial Intervention Program, she made her third and most revealing statement. Cheryl stated that when she returned to her apartment at approximately 10:00 p.m. on September 3, 1983, Roy called her into his "private room," which the women were normally restricted from entering. Roy told her to keep the children in that room, and Roy, Cheryl, Carolyn and Jackie entered the living room. Cheryl stated that Roy, Carolyn, and Jackie began freebasing cocaine until the early morning. According to Cheryl, Savage smoked marijuana frequently and freebased cocaine almost every night. Cheryl left the group and went to sleep with the children.

At approximately 8:00 o'clock the next morning, before leaving for the grocery store, Cheryl noticed her sister, Carolyn, sweeping the floor and Jackie Cobb sitting in the living room. She noticed that Jackie Cobb's face was swollen and that she had two black eyes, caused by a severe beating admitted by Savage the previous week. On returning twenty minutes later, Cheryl heard a female, either Carolyn or Jackie, scream "Hash-

im, no!" Roy Savage then appeared at the door covered with blood, and when she asked him what had happened, he replied: "They were gonna kill you and they were gonna kill me." Cheryl observed puddles of blood and a knife on the apartment floor and blood smeared on the walls.

Savage sent Cheryl and the children to the Lincoln Motel so that he could clean the apartment. He visited her periodically at the motel over that weekend. At one point, he stated that Jackie and Carolyn "were still nursing on themselves and that they were doing ok." She said that when she returned to the apartment, she said defendant told her: "I don't think Aisha [Jackie] is going to make it, she has head injuries.... Amira [Carolyn] might make it, but she might tell on what happened." When Savage asked what he should do with the body, Cheryl suggested he "put it in a box and take it somewhere."

On Wednesday, before Cheryl left for work, she observed Savage carrying a black cloth bag. He did not divulge the contents of the bag but only asked Cheryl if it smelled, and she responded that it did. Savage then discarded the bag in a dumpster in front of an abandoned building on Broad Street.

That following Thursday, Cheryl entered Savage's private room at their 351 Broad Street apartment. She noticed that there were newspapers on the floor, covering a dried-up brownish fluid. The room smelled. Cheryl also noticed that Carolyn's and Jackie's shoes were in the closet.

On Friday afternoon, Roy Savage returned to the apartment with visible head injuries. He asked Cheryl to retrieve a blue suitcase from the twelfth floor of the Projects and to throw it in a dumpster. She refused. The next morning, Cheryl and Savage went to the twelfth floor, but Savage did not remove the suitcase. Instead, he returned to the Broad Street apartment where he had left a second suitcase of black vinyl with plaid side panels. He removed a yellowish plastic bag from the suitcase and discarded it in a dumpster. Savage then cut up

the suitcase, placed it in a garbage bag, and threw it in the incinerator.

B. *The Indictment(s), the Inadvertent Release, and Pretrial Motions*

On January 19, 1984, the Essex County Grand Jury returned a two count indictment against Roy D. Savage, charging him with purposeful and knowing murder of Carolyn Hubbard by his own conduct, contrary to *N.J.S.A.* 2C:11–3a(1) and (2) and with hindering apprehension, contrary to *N.J.S.A.* 2C:29–3. Cheryl Hubbard was charged in count three of the same indictment with hindering apprehension. The State served a Notice of Aggravating Factors registering its intention to prove aggravating factor *N.J.S.A.* 2C:11–3c(4)(c) ("c(4)(c)"). That indictment was dismissed and superceded by a second indictment presented February 2, 1984, which amended the date of the crime. A Notice of Aggravating Factors specifying the same aggravating factor was served pursuant to the superceding indictment.

The Public Defender represented the defendant at his arraignment and entered a plea of not guilty. The Public Defender also filed a number of pre-trial motions challenging the constitutionality of *N.J.S.A.* 2C:11–3, the Death Penalty Act, and death qualification of jurors and served Notice of Intention to Rely *inter alia* on the Insanity Defense or an Absence of State of Mind Defense. On March 28, 1984, a private attorney substituted as counsel. The trial court denied the motions relating to the constitutionality of the statute and to death qualification of jurors. Defendant's new counsel did not pursue the insanity or diminished-capacity defenses.

On Friday, June 22, 1984, after the first indictment had been dismissed, defendant was released and went to New York City. He called his lawyer at 11:30 a.m. on Tuesday, June 26, 1984, to notify him of the release. After communicating with both the Prosecutor's Office and the court, defendant's counsel con-

vinced defendant to turn himself in. Defendant did so on June 26, 1984.

In *State v. Savage*, 198 *N.J.Super.* 507, 487 *A.*2d 790 (Law Div.1984), the court ordered, over defendant's objection, the severance of the charge against Cheryl Hubbard. Jury selection proceeded from January 2 through January 17, 1985. The trial commenced on January 18, 1985, and defendant was found guilty of both counts on January 24, 1985. The jury found that the aggravating factor outweighed the mitigating factors; the court merged the hindering-apprehension count with the murder conviction and sentenced defendant to death on January 28, 1985.

C. *The Trial—Guilt Phase*

1. The State's Case

The State's case centered on the testimony of Cheryl Hubbard. That testimony differed from her prior statements primarily because she was required to omit any reference to defendant's drug use or to Jackie Cobb's murder, disappearance, or even to her presence in the apartment on the morning in question. With those omissions, her testimony at trial substantially corroborated her third, August 23, 1984, statement.

The State also relied on the eyewitness testimony of Cheryl's daughter, Hausikima Hubbard, who was eight years old at the time of the trial. She testified that on the morning of the alleged murder, she watched Savage scrape Carolyn's ear with a nail file, causing her to bleed. Defense counsel argued unsuccessfully that Hausikima was incompetent to testify. In addition, the State produced witnesses from New Jersey and New York who had observed Roy Savage's bizarre behavior during the week following the murder, particularly in carrying the leaky, foul-smelling suitcases and running nude through the streets of New York. Finally, the State presented expert medical testimony from those who had examined the recovered torso. Dr. Pablo Roy, who performed the autopsy, testified that the state of decomposition was consistent with a date of

death approximately four days earlier. He estimated the height of the victim between 5'3" and 5'5"—consistent with Carolyn Hubbard's height—and the victim's weight as approximately 130 pounds—consistent with that of Carolyn Hubbard. Dr. Roy testified that any of the amputations—head or limbs—could have caused death. Dr. Gilbert Melnick, a board-certified radiologist, compared x-rays of Carolyn Hubbard with x-rays of the torso, and testified to a high likelihood that they depicted the same person. This testimony completed the State's case against Roy Savage.

2. The Defense's Case

Defense counsel presented a reasonable-doubt defense, arguing that the State could not prove that defendant had murdered Carolyn Hubbard. Defense counsel called no witnesses. After the State rested, defense counsel moved into the record, over the prosecutor's objections, Cheryl Hubbard's third statement, which recounted the probable killing of Jackie Cobb and the extensive drug use. He argued that the jury could then see the inconsistencies between Cheryl Hubbard's initial testimony and her third statement and could therefore conclude that her testimony was biased and unreliable. He also alleged that the State's medical experts could not prove that the torso belonged to Carolyn Hubbard. Defense counsel did not argue diminished capacity based on the drug use testimony; rather, he based his case on the inconsistency of Cheryl Hubbard's testimony and the inconclusive results drawn by the medical experts.

The trial court charged the jury on manslaughter, aggravated manslaughter, purposeful killing, knowing killing, purposeful causing of serious bodily injury resulting in death, and knowing causing of serious bodily injury resulting in death. The jury returned a verdict of purposely causing death.

D. *The Trial—Penalty Phase*

The sole aggravating factor advanced by the State was c(4)(c), that the murder involved torture, depravity of mind, or aggravated battery. The prosecutor simply moved into evi-

dence the exhibits and testimony from the guilt phase. Defendant sought to establish as mitigating factors that defendant was under extreme mental or emotional disturbance, 2C:11–3c(5)(a); defendant's age, 2C:11–3c(5)(c); that defendant's capacity to appreciate the wrongfulness or his conduct was impaired as a result of mental disease or defect or intoxication, 2C:11–3c(5)(d); that defendant had no significant prior history of criminal conduct, 2C:11–3c(5)(f); and any other factor relevant to defendant's character or record or to the circumstances of the offense, 2C:11–3c(5)(h). The defense called Fay Vonder Savage, Roy's legal wife, who testified that he had been "a good man" who had worked hard, had not gotten into trouble, had provided well for his children, and helped other people. She also related that Roy had turned himself in voluntarily after having been released. Mary Parham, defendant's mother-in-law, testified that she had known defendant for fifteen years, and that "if he did something like that, I really think he would be sick." She recalled an incident while Savage was in the Service, when he had to be hospitalized for "something mental."

After defense counsel's summation, the trial court allowed the defendant to make an unsworn statement. He began by stating that he had been misled to believe that he could not testify without his lawyer's consent. He also alleged that he had received ineffective assistance of counsel, pointing out that his attorney had met with him only once before trial, and had called no witnesses in his defense. He then read a long, rambling letter he claimed to have received from Cheryl Hubbard in which she claims she testified as she did because she was afraid of being killed. He then proceeded to speak to the jury of a massive conspiracy against him by drug pushers and pimps who had been trying to kill him and his women for some time and who had set him up for this crime to get rid of him.

During deliberations, the jury asked whether it had to be unanimous with respect to the existence of mitigating factors. The court proposed instructing the jury that if they are not

unanimous, then those who find the mitigating factor present may consider that in the weighing process. When the defense counsel objected to that instruction, the trial court simply answered the question "no."

The jury found that aggravating factor c(4)(c) existed. The jury also unanimously found that the mental disease/intoxication mitigating factor, c(5)(d), existed, and one juror found that the extreme mental or emotional disturbance factor, c(5)(a), existed. The jury found that the aggravating circumstance outweighed the mitigating and sentenced the defendant to death.

E. *Post–Trial Proceedings, Remand Hearing*

On August 4, 1988, the state applied for an order permitting it to medicate defendant forcibly with anti-psychotic drugs. At a pending hearing the court found that Savage was mentally ill and actively psychotic. Ruling that he was a danger to himself and others, the court granted the state's application, and committed him to the Department of Human Services (DHS). In making that determination, however, the court authorized Savage's continued incarceration at CSU, without a physical transfer to a DHS facility. The Appellate Division affirmed. 233 *N.J.Super.* 356, 558 *A.*2d 1357 (App.Div.1989).

One month later, on September 7, 1988, we remanded the case to the trial court to expand the record on defendant's claim of ineffectiveness of counsel. On November 14, 1988, before addressing the ineffectiveness issue, the trial court held a hearing to determine whether Savage was competent to participate in the remand proceedings. When asked whether he felt competent to participate in such a hearing, Savage responded: "I know I'm competent, feel and know. Knowing is a great sense of feeling." During questioning, he stated that he disagreed with the court's prior determination that he had mental problems requiring medication. Savage also explained that while he was on the Capital Sentencing Unit, there was a "hookup on [his] body," although he did not "really know what

a hookup was." Savage testified that as a result of the "hook up" he was "sodomized and pain was being put to [his] body to force [him] to sign a power of an attorney."

On February 21 and 22, 1989, the Court continued hearings to determine whether defendant was competent to testify in the proceedings and also on the issue of ineffectiveness of counsel. Dr. Peter Schiffman testified for defendant. After meeting with him on several occasions, and once briefly in the courtroom, he expressed his opinion that defendant suffered from paranoid schizophrenia. His review of defendant's background and symptomology was consistent with an onset of the disease while defendant was in his early teens. He based that belief on Savage's totally illogical speech, his intense hallucinations, his bizarre delusional beliefs including webs, hookups, and pain, and his inappropriate emotional tone. He also testified that defendant had suffered from a serious mental illness at the time of the offense.

The attorneys who had been assigned to represent defendant in 1983 by the Public Defender's Office also testified for the defense. They stated that during their representation, they had visited defendant six to eight times in the Essex County Jail. Finding defendant "evasive, hostile, aggressive and paranoid," they had decided after two visits to pursue a psychiatric defense and had planned to have Savage examined by a neurologist. One of the attorneys had based his decision on defendant's drug use, the fact that he had jumped out of a Harlem window and received a head injury, the bizarre facts surrounding the crime, and defendant's demeanor. Additionally, he stated that Savage had physically attacked him once during an interview to demonstrate how a detective had "treated him like a dog." The attorney testified that after having been relieved as counsel, he offered to talk to defendant's new counsel, but counsel had declined the offer.

Defense counsel also was called as a witness. He could not recall how often he visited defendant at the Essex County Jail,

"but could be inclined to agree" with the jail records, which indicated one visit. He admitted that he was aware that the Public Defender had filed a notice of intention to rely on an insanity defense, but when asked why he didn't discuss the case with them, he replied: "For what reason?"

With respect to his investigation, defendant's attorney testified that he worked alone, without the assistance of an investigator. He did not speak with anyone prior to trial except Fay Vonder Savage, although he had some telephone conversations with Savage's brother-in-law and perhaps his father-in-law. He did not communicate with any people listed as possible state witnesses. He did not recall whether he had viewed Hausikima Hubbard's videotaped testimony. He stated emphatically: "I didn't attempt to talk to anybody and that covers the waterfront. The people I wanted to talk to I had statements by." The statements referred to were the statements of witnesses given to the State. He did, however, "invest three or four beers" in Newark bars "to see what [he] could hear about the defendant."

Defense counsel did not communicate with the State's experts who identified Carolyn Hubbard's torso. He retained no experts of his own to challenge their testimony. Counsel never reached out for a psychiatric or mental health professional to evaluate Savage's mental state. He explained that "nothing jog[ged] [his] mind" that such an examination was necessary, because ."at no time in [his] contact with Mr. Savage did [he] ever get the impression that [Savage] had any kind of mental disease or aberration." He was aware of records regarding Savage's psychiatric hospitalization while in the Navy, but deemed them "umimportant. I didn't follow it up." He dismissed as "third-hand hearsay" the suggestion in a police report that Savage jumped out of a Harlem window.

When asked whether he had informed Savage of his right to testify, counsel responded: "I think" I spoke to Mr. Savage about it, and "I suppose" he elected not to testify. He also

stated that he "probably" explained his strategy to defendant, but could not recall how he did it. He stated that his defense centered on impeaching Cheryl Hubbard's testimony by pointing out her self-interest and the inconsistencies between her three statements. He never showed defendant Cheryl Hubbard's August 23, 1984, statement implicating him in the crime. When asked whether he had considered that Cheryl Hubbard's statement implicated defendant in Jackie Cobb's murder, he explained that Savage was not charged with that murder, and moreover that the Supreme Court might find that the judge erred in not excising the statement. He did not recall that during trial, he strongly opposed excising the statement.

Dr. Azariak Eshkenazi testified for the State that defendant was presently competent to proceed in the remand hearing. Describing Savage as illogical, paranoid, delusional, and hallucinating, Dr. Eshkenazi suggested that Savage suffered from a "well-encapsulated delusional disorder." He believed that when Savage committed the offense, he was neither insane nor unable to form the intent to commit a crime as the result of a mental disease or defect. Additionally, Dr. Eshkenazi believed that Savage had been competent to testify during his trial.

At the conclusion of testimony, the trial court found that defendant was competent to participate in the remand proceeding. It also ruled that counsel had not rendered ineffective assistance, at the guilt phase, finding that his performance was neither deficient nor prejudicial to defendant.

## II

### *Ineffective Assistance of Counsel*

#### A.

The principal issue on this appeal is whether defendant was denied effective assistance of counsel in violation of the sixth amendment of the federal Constitution and Article I, paragraph 10 of the state Constitution. To evaluate that claim, we turn

first to the constitutional standards set forth by the United States Supreme Court in *Strickland v. Washington,* 466 *U.S.* 668, 104 *S.Ct.* 2052, 80 *L.Ed.*2d 674 (1984), and adopted by this Court in *State v. Fritz,* 105 *N.J.* 42, 519 *A.*2d 336 (1987), in interpreting our state constitution.

In *Strickland v. Washington,* the Court set forth the federal-constitutional standards for evaluating ineffective assistance-of-counsel claims. Writing for the Court, Justice O'Connor stated the guiding principle: "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a fair result." 466 *U.S.* at 686, 104 *S.Ct.* at 2064, 80 *L.Ed.*2d at 692–93. There the ineffectiveness claim arose in the sentencing phase of a bifurcated capital proceeding. Justice O'Connor noted, therefore, that the Court was not considering the role of counsel "in an ordinary sentencing, which may involve informal proceedings and standardless discretion ... and hence may require a different approach to the definition of constitutionally effective assistance." *Id.,* 466 *U.S.* at 687, 104 *S.Ct.* at 2064, 80 *L.Ed.*2d at 693. The Court reasoned that because a capital sentencing proceeding is conducted like a trial, the identical "benchmark" principle—assurance of a just result—applies. *Id.* at 687, 104 *S.Ct.* at 2064, 80 *L.Ed.*2d at 693.

To lend content to that principle, the Court announced a two-part requirement that a defendant must meet in order to show ineffectiveness of assistance:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable. [*Id.* at 687, 104 *S.Ct.* at 2064, 80 *L.Ed.*2d at 693].

■ With respect to deficient performance, the Court said the test is whether counsel's conduct fell below an objective standard of reasonableness. *Id.* at 688, 104 *S.Ct.* at 2064, 80 *L.Ed.*2d at 693. Therefore, a defendant challenging assistance of counsel must demonstrate that counsel's actions were beyond the "wide range of professionally competent assistance." *Id.* at 690, 104 *S.Ct.* at 2066, 80 *L.Ed.*2d at 695. The Court also cautioned that "counsel is strongly presumed to have rendered adequate assistance" and to have made "all significant decisions in the exercise of reasonable professional judgment." *Id.,* at 690, 104 *S.Ct.* at 2066, 80 *L.Ed.*2d at 695.

■ In order to satisfy the second prong—that a defendant has been prejudiced by counsel's actions—there must be a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 *S.Ct.* at 2068, 80 *L.Ed.*2d at 698. In setting forth such guidelines, the Court cautioned that "the principles ... stated do not establish mechanical rules. Although those principles should guide the process of decision, the ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged." *Id.* at 696, 104 *S.Ct.* at 2069, 80 *L.Ed.*2d at 699.

The *Strickland* Court went on to note, however, that in cases in which counsel's performance is tantamount to a complete denial of representation, prejudice can be presumed. *Id.* at 692, 104 *S.Ct.* at 2067, 80 *L.Ed.*2d at 696. The Court explained that constructive denial of assistance of counsel altogether or a conflict of interest are examples of *per se* ineffective performance. Elaborating on those concerns in *United States v. Cronic,* 466 *U.S.* 648, 104 *S.Ct.* 2039, 80 *L.Ed.*2d 657 (1984), decided the same day as *Strickland,* the Court explained that when counsel's errors are so grave that "no amount of showing of want of prejudice could cure it," it is unnecessary for a defen-

dant to demonstrate prejudice. *Id.* at 659, 104 *S.Ct.* at 2046, 80 *L.Ed.*2d at 668 (citations omitted).

Relying on state constitutional principles, we adopted the *Strickland* standards in *State v. Fritz*, 105 *N.J.* 42, 519 *A.*2d 336 (1987). There we noted that "[e]ven if we are not constitutionally compelled to adopt the *Strickland–Cronic* test, ... [we] ... recognize the soundness and efficacy of both the substance and formulation of this ... standard in defining our own State Constitutional guarantee." *Id.* at 58, 519 *A.*2d 336. Thus, as a matter of state law, we declared that "if counsel's performance has been so deficient as to create a reasonable probability that these deficiencies materially contributed to defendant's conviction, the constitutional right will have been violated." *Ibid.*

Most recently, in *State v. Davis*, 116 *N.J.* 341, 561 *A.*2d 1082 (1989), we ruled that the *Fritz* principles were applicable in capital-murder cases. Declining to adopt stricter standards for judging constitutional rights in a capital case, we reasoned that "[t]o judge capital defendants differently would effectively diminish the rights of non-capital defendants, a disquieting result that we reject." *Id.* at 356, 561 *A.*2d 1082. We cautioned, however, that capital defense counsel should have an expertise regarding the special considerations present in capital cases. *Id.* at 356, 561 *A.*2d 1082. Moreover, we emphasized our commitment to a searching review of capital records and our enhanced application of the harmless error standard when reviewing capital prosecutions. *Ibid.* We reaffirm those principles today.

### B.

We now turn to defendant's ineffectiveness claim. Defendant alleges that he was denied effective assistance of counsel in the guilt phase of his trial by his counsel's failure (1) to consult adequately with him in preparing his case; (2) to investigate and pursue a psychiatric and/or diminished capacity

defense; (3) to advise defendant of his right to testify; and (4) by counsel's introduction of highly prejudicial evidence. He claims he was denied effective assistance at the penalty phase by counsel's failure to investigate and to present a "meaningful" case in mitigation. We first consider whether defendant is entitled to a presumption of prejudice under *Cronic*.

In insisting that the *Cronic* analysis is appropriate, defendant points out that counsel consulted with him personally only once during trial preparation. He asserts that in a capital case, it is *per se* unreasonable to have only one personal meeting with a defendant prior to trial. Underlying that assertion is defendant's ultimate concern that by failing to consult with him, counsel failed to investigate all possible defenses and develop a sound trial strategy.

■ As *Strickland* and *Cronic* make clear, however, the *per se* analysis is reserved for those cases in which counsel's performance is so likely to prejudice the accused that it is tantamount to a complete denial of counsel. *United States v. Cronic, supra,* 466 *U.S.* at 659, 104 *S.Ct.* at 2046, 80 *L.Ed.*2d at 668; *Strickland v. Washington, supra,* 466 *U.S.* at 692, 104 *S.Ct.* at 2067, 80 *L.Ed.*2d at 696. For example, counsel's failure to appear at a "critical stage" of the proceedings, *see, e.g., Siverson v. O'Leary,* 764 *F.*2d 1208 (7th Cir.1985) (defense counsel absent during return of the verdict and jury deliberations), or counsel having an actual conflict of interest, *see, e.g., Government of Virgin Islands v. Zepp,* 748 *F.*2d 125 (3d Cir.1984) (defense counsel faced criminal liability on same charges on which defendant was tried and acted as prosecution's witness), would justify a presumption of prejudice. In such instances, the "circumstances are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." *United States v. Cronic, supra,* 466 *U.S.* at 658, 104 *S.Ct.* at 2046, 80 *L.Ed.*2d at 667.

■■ In most instances, a defense attorney who communicates with a defendant only once before a capital trial would

warrant the *Cronic per se* analysis. Defense counsel, however, alleges that although he had only one meeting with defendant, he communicated with him at least fifteen to thirty times by telephone. We recognize that it is not the frequency of consultation that reveals whether a defendant has been effectively denied effective legal assistance. Rather, the proper inquiry is whether as a result of that consultation, counsel was able properly to investigate the case and develop a reasonable defense. Thus, the type of ineffectiveness that defendant alleges is best evaluated under the two-prong *Strickland* analysis. As the Supreme Court stated:

> [W]hen a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable. In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions. [*Strickland v. Washington, supra,* 466 *U.S.* at 691, 104 *S.Ct.* at 2066, 80 *L.Ed.*2d at 696].

We do not suggest that defense counsel's one pre-trial consultation in this capital case was sufficient. Indeed, in the context of defense counsel's overall performance, we find that it was not. Nonetheless, considering all of counsel's communications with defendant, we find that defendant was not so distinctly prejudiced as to warrant the *per se* analysis. Instead, we review defense counsel's actions under the two-prong *Strickland* standard.

### C.

We consider first whether counsel's performance was deficient under the first prong of the *Strickland* test. We are mindful that our inquiry is whether counsel's performance was "reasonable considering all the circumstances." *Strickland v. Washington, supra,* 466 *U.S.* at 688, 104 *S.Ct.* at 2064, 80 *L.Ed.*2d at 694. If counsel thoroughly investigates law and facts, considering all possible options, his or her trial strategy is "virtually unchallengable." *Id.* at 690–91, 104 *S.Ct.* at 2065–66, 80 *L.Ed.*2d at 695. But strategy decisions made after less

than complete investigation are subject to closer scrutiny. Indeed, counsel has a duty to make "reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691, 104 *S.Ct.* at 2066, 80 *L.Ed.*2d at 695. A failure to do so will render the lawyer's performance deficient.

■ Defense counsel's theory was that the State could not prove that defendant had murdered Carolyn Hubbard. He relied principally on Cheryl Hubbard's trial testimony, arguing that it was biased and inconsistent with her pre-trial statements. He also alleged that the State's medical expert would have difficulty proving that the discovered torso belonged to Carolyn Hubbard. He pursued no other defense. Given the overwhelming evidence of defendant's guilt, the court on remand found that defense counsel presented the only reasonable and credible defense. We disagree.

Our major difficulty with defense counsel's strategy is that it was not preceded by a "thorough investigation of law and facts" and a consideration of all "plausible options." *Id.* at 690–91, 104 *S.Ct.* at 2065–66, 80 *L.Ed.* at 695. There were numerous facts in the record that indicated the importance of investigating a psychiatric or diminished-capacity defense. Four days after the crime occurred defendant was hospitalized after he claimed he was pushed, although there is a suggestion that he might have jumped, out of a Harlem window. He was picked up from the sidewalk and hospitalized. In his statement to police he stated that an unidentified woman with long braids appeared at his hospital bed, put a gun to his head, and ordered him to move a suitcase containing a human torso throughout the New York area. Because his life and that of his loved ones were threatened, he followed her command. Witnesses testified that defendant fled from the hospital and ran naked through the streets of Harlem. They also testified that he was transporting leaky suitcases from a building in New York to various locations in New Jersey. The suitcases reeked so badly

and he looked so bizarre that numerous witnesses noticed and remembered. On the morning of the murder when defendant answered the door covered in blood, he allegedly told Cheryl Hubbard that Jackie Cobb and Carolyn Hubbard had tried to kill him and were planning to kill Cheryl. The behavior of defendant, during and after the crime, so strongly indicates that he may have been suffering from mental problems that we find it incomprehensible that counsel never even considered a psychiatric defense.

Moreover, Cheryl Hubbard's third statement, which defense counsel insisted on introducing at trial, revealed that defendant had used cocaine throughout the night preceding the murder, and thus may have suffered from hallucinations or delusions. Counsel was also aware, on assuming the case, that defendant had been hospitalized for a mental condition while serving in the Navy. In our view, counsel's decision to forgo a psychiatric examination when defendant had admittedly participated in such bizarre conduct, and possibly had a history of mental illness and drug abuse, is contrary to professional norms of competent assistance. "The usefulness of a thorough evaluation in a case where the capital defendant has problems of this kind is obvious." *Burger v. Kemp*, 483 *U.S.* 776, 813, 107 *S.Ct.* 3114, 3135, 97 *L.Ed.*2d 638, 669 (1987). (Blackmun, J., concurring).

■ Nor can we find that defense counsel conducted an adequate investigation either through personal consultation with defendant or through independent sources on the basis of which he could conclude that further inquiry into a psychiatric defense was unnecessary. Although *Strickland* teaches that "[n]o particular set of detailed rules" should govern counsel's conduct, 466 *U.S.* at 688–89, 104 *S.Ct.* at 2064–65, 80 *L.Ed.*2d at 694, "[r]epresentation of a criminal defendant entails certain basic duties." *Id.* at 688, 104 *S.Ct.* at 2064, 80 *L.Ed.*2d at 694. One basic defense function is pre-trial consultation. The American Bar Association Guidelines counsel that the initial step of

any capital investigation is a personal consultation with the defendant. The Guidelines stress that such a meeting is necessary in order to explore other potential sources of information as well as the defendant's mental state. *ABA Guidelines for the Appointment. and Performance of Counsel in Death Penalty Cases,* Guideline § 11.4.1, Investigation (Feb.1989) at 93–94 (hereinafter "Guidelines"). The Guidelines also emphasize that

> [c]lient interviews are vital for establishing the trust between attorney and client necessary to allow the attorney to learn the facts. Counsel cannot frame an adequate defense without knowing what is likely to develop at trial, including information that is or that appears to be incriminating.
>
> [Guidelines, Commentary at 97.]

Echoing the ABA's concern, albeit in a non-capital context, we stated in *Fritz* that adequate consultation with a defendant is essential to rendering effective assistance of counsel. *State v. Fritz, supra,* 105 *N.J.* at 52, 519 *A.*2d 336. In a capital trial, where strategy is crucial to the life-or-death determination, the need for adequate pretrial consultation becomes paramount. In the present case, however, defense counsel neglected to make relevant, and in fact critical, inquiries during his pre-trial consultations with defendant. Remarkably, he personally consulted with defendant only once prior to trial. During that meeting, he did not question defendant about his drug use on the night preceding the murder, or a possible drug addiction—facts important to evaluating a diminished-capacity, intoxication, or insanity defense. He never inquired about defendant's psychiatric hospitalization while in the Navy—he deemed that "unimportant." Although the public defenders described Savage as "evasive, hostile, aggressive and paranoid" during their meetings, defense counsel testified that he never got that "impression"—perhaps because his contact was limited to one pre-trial consultation. He did not question defendant's seemingly-contradictory explanations for his bizarre actions, particularly the reasons for his hospitalization in Harlem. By failing to make those fundamental inquiries and observation at the onset, coun-

sel deprived himself of a reasonable basis on which to later make *informed* tactical defense decisions.

Additionally, defense counsel pursued no independent areas of investigation in formulating his defense strategy. The Guidelines emphasize the importance of interviewing potential witnesses during pre-trial investigation. *Guidelines, supra,* at 93. Yet counsel interviewed none of the State's witnesses who observed defendant's appearances during the week of the murder, and denied making any efforts to speak with Cheryl Hubbard, Tammy Cherry, or Hausikima Hubbard, who were key prosecution witnesses. He instead explained: "I did not attempt to talk to anyone and that covers the waterfront. The people I wanted to talk to I got statements by." By reason of such neglect, he was thus unable to fully evaluate the strength of the State's case and thus his own strategy.

Although counsel spoke with defendant's wife and brother-in-law, they did not reveal, and he communicated with no other witnesses who could have revealed, insight into defendant's past, particularly his mental state and his prior drug abuse. He never consulted a mental health professional to obtain an independent medical appraisal of defendant's mental state. Additionally, counsel knew that the Public Defender's Office had considered relying on an insanity defense, yet he never discussed the case at length with attorneys from that office or questioned the basis for their strategy decision. In fact, when asked whether he had communicated with them, he responded "For what reason?" In sum, his pre-trial investigation was no investigation at all. By his actions, counsel failed "to make the adversarial testing process work," *Strickland v. Washington, supra,* 466 *U.S.* at 690, 104 *S.Ct.* at 2066, 80 *L.Ed.*2d at 695, a result we find intolerable in a capital prosecution.

The State argues that because of the circumstantial evidence presented in the case, counsel's decision to pursue a "reasonable doubt defense" was a legitimate tactical decision. In our view, however, defense counsel failed thoroughly to consider

the soundness of his own strategy and was thus unable to conclude that he was pursuing a plausible defense. His case centered on impeaching Cheryl Hubbard's testimony, by introducing her third inconsistent pre-trial statement. In so doing, however, he did not consider the danger of presenting Hubbard's unexcised testimony implicating defendant in the murder of Jackie Cobb. When asked whether he had considered that fact, he responded, "Yeah ... but Roy Savage was not charged with Jackie Cobb['s] murder ... [and] the Supreme Court may find that the judge erred in not excising it." He had no recollection, however, that as part of his strategy, he had vehemently opposed exising it. Moreover, he also alleged that his strategy consisted of challenging the State's expert testimony identifying Carolyn Hubbard's torso. Yet defense counsel never communicated with the State's experts who were expected to testify, nor did he call any experts of his own to challenge the State's anticipated testimony.

■ Finally, the State points out that for counsel to have pursued a diminished-capacity or insanity defense would have been inconsistent with his trial theory—that Roy Savage did not kill Carolyn Hubbard. Our concern, however, is not solely with the defense that counsel ultimately chose, but that he chose his theory without first taking minimal investigatory steps. At a minimum, an expert appraisal of defendant's mental condition and the effect of cocaine on his mental state was critical to making a competent strategy decision with respect to a diminished capacity or insanity defense. Defense counsel simply reasons that he failed to do so because "nothing jogged his mind." On the facts of this case, we find that explanation wholly unacceptable and indicative of his lack of expertise with respect to the "special considerations in a capital case." *State v. Davis, supra,* 116 *N.J.* at 356, 561 *A.*2d 1082. His strategy at trial is therefore "rob[bed] of any presumption of competence," *id.* at 357, 561 *A.*2d 1082, and thus deficient under *Strickland* and *Fritz.*

## D.

We next consider defendant's claim that counsel rendered deficient performance at the penalty phase by failing to present a "meaningful" case in mitigation. Primarily, we note that "[a] capital sentencing proceeding is 'sufficiently like a trial in its adversarial format and in the existence of standards for decision' that counsel's role in the two proceedings is comparable —[ ] 'to ensure that the adversarial testing process works to produce a just result.' " *Burger v. Kemp, supra,* 483 *U.S.* at 788, 107 *S.Ct.* at 3122, 97 *L.Ed.*2d at 653 (quoting *Strickland v. Washington, supra,* 466 *U.S.* at 686–87, 104 *S.Ct.* 2054, 80 *L.Ed.*2d 674). Thus, our inquiry is whether in preparing defendant's case in mitigation, counsel's actions were within the "wide range of professionally competent assistance." *Strickland v. Washington, supra,* 466 *U.S.* at 690, 104 *S.Ct.* at 2066, 80 *L.Ed.*2d at 695.

Defense counsel called defendant's wife, Fay Vonder Savage, and defendant's mother-in-law, Mary Parham, at the penalty trial. Both expressed their belief that defendant was innocent, and defendant's wife related that defendant was a good husband and father. Defendant's mother-in-law alluded to defendant's hospitalization for "something mental" while in the Navy. She offered no specific details with respect to that incident. Defense counsel called no other witnesses.[2]

Although defense counsel presented five mitigating factors—two specifically linked to defendant's mental state—he offered no expert testimony regarding defendant's mental state. In developing his case in mitigation, defense counsel failed to explore obvious sources of information regarding defendant's background and mental state, directly relevant to those five mitigating factors. Mary Parham related that defendant had

---

[2]*See infra* at 637–638, 577 *A.*2d at 477. Defense counsel called Eugene McLucas, a cellmate of Savage's from the County Jail. The trial court disallowed his testimony regarding Cheryl Hubbard as double hearsay.

been hospitalized in the Navy for "something mental," yet counsel did not consult any mental health professionals or review any Navy records regarding that incident. Certainly, any indications of mental illness were directly relevant to the extreme mental or emotional disturbance factor, c(5)(a), and the mental-disease or intoxication factor, c(5)(d). Defense counsel introduced Cheryl Hubbard's third statement, which referred to Savage's drug use, but he did not investigate or consider other sources of information that could have further substantiated that addiction. Defendant's wife revealed that defendant had served in the Navy and that former employers and schoolmates would have testified on his behalf—facts certainly relevant to the c(5)(h) "catch all" factor. But counsel interviewed no potential witnesses with respect to defendant's background; he did not investigate, and hence presented no evidence regarding, defendant's education, religious or cultural influences, or employment history. In sum, counsel provided the jury with little or no evidence to find any mitigating factor.

*Strickland* and *Fritz* make clear that the essence of effective representation is the "fundamental fairness of the proceeding whose result is being challenged." *Strickland v. Washington, supra,* 466 *U.S.* at 696, 104 *S.Ct.* at 2069, 80 *L.Ed.*2d at 699; *State v. Fritz,* 105 *N.J.* at 58, 519 *A.*2d 336. By failing to inquire into the very facts that could support his case in mitigation, counsel's performance "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington, supra,* 466 *U.S.* at 686, 104 *S.Ct.* 2063, 80 *L.Ed.*2d at 692–93. Unlike the attorney in *Burger v. Kemp, supra,* who investigated defendant's history, interviewed potential witnesses and examined defendant's psychiatric reports, Savage's counsel did not make a "reasonable decision that his client's interests would not be served by presenting [additional mitigating] evidence." 483 *U.S.* at 791, 107 *S.Ct.* at 3124, 97 *L.Ed.*2d at 655.

That critical element of investigation has been the focus of post-*Strickland* courts analyzing ineffectiveness claims in the penalty phase of capital trials. *See, e.g., Jones v. Thigpen,* 788 *F.*2d 1101 (5th Cir.1986) (defense counsel presented no mitigating evidence, despite fact that defendant was mentally retarded, 17 years of age at the time of the crime) *cert. denied,* 479 *U.S.* 1087, 107 *S.Ct.* 1292, 94 *L.Ed.*2d 148 (1987); *Thomas v. Kemp,* 796 *F.*2d 1322 (11th Cir.) (defendant's lawyer "made little effort to investigate possible sources of mitigating evidence" and, in fact, made no effort beyond interviewing defendant's mother) *cert. denied,* 479 *U.S.* 996, 107 *S.Ct.* 602, 93 *L.Ed.*2d 601 (1986); *Blake v. Kemp,* 758 *F.*2d 523 (11th Cir.) (defense counsel made no preparation for penalty phase), *cert. denied,* 474 *U.S.* 998, 106 *S.Ct.* 374, 88 *L.Ed.*2d 367 (1985). By failing to inquire into such critical facts in support of his case in mitigation, we likewise conclude that under *Strickland* and *Fritz* counsel's performance in the penalty phase, as in the guilt phase, was deficient.

E.

 Having concluded that defense counsel's performance at both the guilt and sentencing phases of trial fell below an objective standard of reasonableness, we finally consider whether that inadequate performance prejudiced the defendant. Seldom is there so much evidence that indicates that a defendant has serious mental problems. *Supra* at 618–619, 577 *A.*2d at 467. The record so obviously suggests that, at a minimum, counsel should have considered a diminished capacity and insanity defenses in the guilt phase of the trial. In our view, if defense counsel had made a reasonable investigation into defendant's mental state, and had presented a psychiatric defense, there "is a reasonable probability that ... the result of the [guilt phase proceedings] would have been different." *Strickland v. Washington, supra,* 466 *U.S.* at 695, 104 *S.Ct.* at 2068, 80 *L.Ed.*2d at 698. Defense counsel's failure to present evidence in support of those defenses "materially contributed to

his conviction," and hence his "constitutional right [ ] [has] been violated." *State v. Fritz, supra,* 105 *N.J.* at 58, 519 *A.*2d 336.

Additionally, we find that if defense counsel had presented additional information at the penalty phase regarding defendant's mental state, there is a reasonable probability that a jury would have concluded that "the balance of aggravating and mitigating factors did not warrant death." *Strickland v. Washington, supra,* 466 *U.S.* at 695, 104 *S.Ct.* at 2068, 80 *L.Ed.*2d at 698. Hence, we conclude that counsel rendered ineffective assistance in both the guilt and penalty phases of trial in violation of the federal and state constitutions.

### III

### *Right to Testify*

#### A.

Defendant did not testify during the guilt phase of his trial. He did testify during the penalty phase, after the trial court advised him of that right. Defendant now claims that the trial court's failure to advise him of his right during the guilt phase—and the court's corollary failure to ascertain the knowing and voluntary nature of the waiver of his right—deprived him of his constitutionally-protected right to testify. We first consider whether the right to testify is protected under our state constitution.

In *Rock v. Arkansas,* 483 *U.S.* 44, 107 *S.Ct.* 2704, 97 *L.Ed.*2d 37 (1987), the United States Supreme Court explicitly recognized the constitutional right to testify, finding its roots firmly established in several provisions of the federal Constitution. The Court explained that the right emanates from the fourteenth amendment. "It is one of the rights that [is] 'essential to due-process of law in a fair adversarial process.'" *Id.* at 51, 107 *S.Ct.* at 2709, 97 *L.Ed.*2d at 46 (citing *Faretta v. California,* 422 *U.S.* 806, 819 n. 15, 95 *S.Ct.* 2525, n. 15, 45 *L.Ed.*2d 562 n. 15 (1975)). "The right to testify is also found in the Compul-

sory Process Clause of the Sixth Amendment, which grants a defendant the right to call 'witnesses in his favor.' " *Id.* 483 *U.S.* at 52, 107 *S.Ct.* at 2709, 97 *L.Ed.*2d at 46. The Court explained that a defendant's right to call witness as on his own behalf "logically include[s]" the right to testify. *Id.* Moreover, the court reasoned that the opportunity to testify is also a necessary corollary to the fifth amendment's privilege against self-incrimination. *Id.* at 52, 107 *S.Ct.* at 2709, 97 *L.Ed.*2d at 47.

The *Rock* decision synthesizes prior decisional law, in which the Supreme Court had implicitly recognized the constitutionally-protected right to testify. *See, e.g., Nix v. Whiteside,* 475 *U.S.* 157, 164, 106 *S.Ct.* 988, 993, 89 *L.Ed.*2d 123, 133 (1986) ("Although this Court has never explicitly held that a criminal defendant has a due process right to testify . . . the right has long been assumed."); *Jones v. Barnes,* 463 *U.S.* 745, 751, 103 *S.Ct.* 3308, 3312, 77 *L.Ed.*2d 987 (1983) (the "ultimate authority to make certain fundamental decisions . . . [including] whether to testify" rests with the defendant); *Harris v. New York,* 401 *U.S.* 222, 225, 91 *S.Ct.* 643, 645, 28 *L.Ed.*2d 1, 4 (1971) ("Every criminal defendant is privileged to testify in his own defense, or to refuse to do so").

The right to testify in New Jersey is guaranteed by statute. *N.J.S.A.* 2A:81–8. Early courts in New Jersey, however, also viewed it as a "civil right," protected under the fourteenth amendment to the federal constitution:

> It may be suggested that the civil rights protected by this clause of the constitution are only those which were recognized when the constitution was framed, and that, therefore, the right of the litigant to be a witness for himself having been created since that time, it is not among those thus secured. But it would, I think, be unreasonably cramping this provision thus to confine it. [*Percey v. Powers,* 51 *N.J.L.* 432, 435, 17 *A.* 969 (Sup.Ct.1859).]

*Percey* involved the right of a party to testify in a civil proceeding. Subsequently, in *State v. Levine,* 109 *N.J.L.* 503, 162 *A.* 909 (Sup.Ct.1932), the court extended the reasoning of *Percey* to a criminal trial, holding that a state could not bar a criminal defendant from testifying on the basis of his or her

religious beliefs. *Id.* at 512, 162 *A.* 909. Thus, the right to testify, though statutory in origin, was afforded additional constitutional protection by early New Jersey courts.

Although New Jersey courts have not expressly recognized a right to testify emanating from our state constitution, they, like the Pre–*Rock* federal courts, have implicitly assumed its existence. *See, e.g., State v. Kremens,* 57 *N.J.* 309, 313, 272 *A.*2d 537 (1970) (defendant's failure to testify resulted from a "knowledgable waiver of that right"); *State v. Gonzalez,* 223 *N.J.Super.* 377, 538 *A.*2d 1261 (App.Div.) (considering whether the right to testify is "absolute") *certif. denied,* 111 *N.J.* 589, 546 *A.*2d 514 (1988); *State v. Vigilante,* 194 *N.J.Super.* 560, 563, 477 *A.*2d 429 (Law Div.1983) (right to testify is of a "Constitutional dimension").

■ In our view, the right to testify is essential to our state-based concept of due process of law, which guarantees a "fair and impartial trial in which there is a legitimate and decorus recognition of the substantive rights of the defendant." *State v. Morriggi,* 15 *N.J.Super.* 479, 481, 83 *A.*2d 612 (App. Div.1951). The right is also implicit in our state constitutional guarantee for a criminal defendant "to have compulsory process for calling witnesses in his [or her] favor." *N.J. Const.* art. I, ¶ 10. We therefore hold today that a criminal defendant is entitled to testify on his or her own behalf under Article I, paragraphs 1 and 10 of our State Constitution. Our holding affirms the soundness and efficacy of our prior state decisional law in this area.

### B.

Having ruled that the right to testify is guaranteed under our state constitution, we now consider whether defendant's right was violated. He claims that waiver of the right to testify, like all fundamental rights, can be established only by an "intentional relinquishment or abandonment." *Johnson v. Zerbst,* 304 *U.S.* 458, 464, 58 *S.Ct.* 1019, 1023, 82 *L.Ed.* 1461, 1466 (1938).

Since the trial court did not inform him, on the record, of his right to testify, he claims that he did not knowingly and intelligently waive his right.

In addressing that claim, we look for guidance to the decisional law in this state regarding waiver of a defendant's right against self-incrimination—the right *not* to testify. Recently, in *State v. Bogus,* 223 *N.J.Super.* 409, 538 *A.*2d 1278 (App.Div. 1989), the Appellate Division held that when a defendant is represented by counsel, the trial court does not have a duty to advise defendant of his or her right not to testify or to explain the consequences that the testimony may produce. *Id.* at 426, 538 *A.*2d 1278. Citing authority from other jurisdictions, *e.g.,* *People v. Longwith,* 125 *Cal.App.*3d 400, 178 *Cal.Rptr.* 136 (Ct.App.1981); *People v. Mozee,* 723 *P.*2d 117 (Colo.1986); *State v. McKenzie,* 17 *Md.App.* 563, 303 *A.*2d 406 (Ct.Spec.App.1973), the court reasoned that the decision to testify is a strategical choice, and it is therefore the duty of counsel, not the trial court, to advise a defendant on whether to testify. *Id.* 223 *N.J.Super.* at 423–24, 538 *A.*2d 1278. Moreover, to discuss the issue with a defendant might "inappropriately involve the trial court in the unique attorney-client relationship, raising Sixth Amendment as well as Fifth Amendment concerns." *Id.* at 424, 538 *A.*2d 1278.

Addressing those constitutional concerns, the Supreme Judicial Court of Massachusetts explained:

Unlike most rights, the right to testify is counterpoised by the right not to testify. Therefore, the exercise of one is the waiver of the other.... We do not think that the right to testify would be protected by requiring the judge to conduct a voir dire examination. Not only would the proper point at the trial to conduct the voir dire be uncertain, but the judge's role in this strategic decision would be problematic; to the extent the judge appeared to urge the defendant to exercise the right to testify, the judge would appear to urge the defendant to waive the right not to testify. [*Commonwealth v. Waters,* 399 *Mass.* 708, 506 *N.E.*2d 859, 865 *reh'g denied,* 400 *Mass.* 1006, 511 *N.E.*2d 356 (1987).]

We agree that the constitutional tension inherent in requiring a trial court to advise a defendant of his right not to testify, recognized in *Bogus,* is also present when a trial court

is asked to inquire whether a defendant has waived his or her right to testify. Thus, we hold that when a defendant is represented by counsel, the trial court is not required to inform defendant of his right to testify or explain the consequences of that choice. As the *Siciliano* court so succinctly stated:

> To require the trial court to follow a special procedure, explicitly telling defendant about, and securing an explicit waiver of, a privilege to testify ... could inappropriately influence the defendant to waive his constitutional right *not* to testify, thus threatening the exercise of this other, converse, constitutionally explicit, and more fragile right. [*Siciliano v. Vose*, 834 *F.*2d 29, 30 (1st Cir.1987).]

Our position is consistent with the vast majority of courts—both state and federal—that have similarly held that courts have no obligation to address a defendant and inquire whether he or she waives the right to testify. *See, e.g., U.S. v. Martinez,* 883 *F.*2d 750 (9th Cir.1989); *Ortega v. O'Leary,* 843 *F.*2d 258 (7th Cir.), *cert. denied,* 488 *U.S.* 841, 109 *S.Ct.* 110, 102 *L.Ed.*2d 85 (1988); *United States v. Janoe,* 720 *F.*2d 1156 (10th Cir.1983), *cert. denied,* 465 *U.S.* 1036, 104 *S.Ct.* 1310, 79 *L.Ed.*2d 707 (1984); *Siciliano v. Vose, supra,* 834 *F.*2d at 30; *People v. Longwith,* 125 *Cal.App.*3d 400, 178 *Cal.Rptr.* 136 (Ct.App.1981); *Torres–Arboledo v. State,* 524 *So.*2d 403 (Fla. 1988); *People v. Simmons,* 140 *Mich.App.* 681, 364 *N.W.*2d 783 (1985); *State v. Albright,* 96 *Wis.*2d 122, 291 *N.W.*2d 487 (1980) *cert. denied,* 449 *U.S.* 957, 101 *S.Ct.* 367, 66 *L.Ed.*2d 223 (1980). *But see People v. Curtis,* 681 *P.*2d 504 (Col.1984) (trial court has obligation to inquire whether a defendant waives the right to testify); *State v. Neuman,* 371 *S.E.*2d 77 (W.Va.1988) (trial court must advise defendant of his right to testify and ascertain whether waiver is voluntary, knowing and intentional).

The question remains, then, how is a defendant informed of his constitutionally-protected right to testify? As with the right against self-incrimination, we find that "it is the responsibility of a defendant's counsel, not the trial court, to advise defendant on whether or not to testify and to explain the tactical advantages or disadvantages or doing so or not doing so." *State v. Bogus, supra,* 223 *N.J.Super.* at 423, 538 *A.*2d

1278. Counsel's responsibility includes advising a defendant of the benefits inherent in exercising that right and the consequences inherent in waiving it. To ensure that counsel meets that obligation, it may be the better practice for a trial court to inquire of counsel whether he or she had advised a defendant, particularly a, capital defendant, of his or her right to testify. This will best ensure that defendant's constitutional rights are fully protected. Indeed, counsel's failure to do so will give rise to a claim of ineffectiveness of counsel.

Because we find that counsel's performance was otherwise constitutionally deficient, we do not consider whether counsel failed to advise defendant of his right to testify. On remand, however, we emphasize that it is counsel's obligation to apprise defendant of all of his constitutionally-protected rights, including the right to testify. The decision whether to testify, although ultimately defendant's, is an important strategical choice, made by defendant in consultation with counsel. Thus, on remand, defense counsel's actions with respect to informing the defendant of his right to testify will be evaluated under the constitutional standards regarding effective assistance of counsel set forth in *State v. Fritz, supra,* 105 *N.J.* at 53–58, 519 *A.*2d 336, and *State v. Davis, supra,* 116 *N.J.* at 350–57, 561 *A.*2d 1082.

## IV

### A. *Additional Issues: Guilt Phase*

Preliminarily, we note that defendant challenges the constitutionality of the death penalty in New Jersey, both on its face and as applied under the state and federal constitutions, and in particular, factor c(4)(c). He also challenges the jury selection system in Essex County as unconstitutionally unrepresentative. We have considered both arguments, and conclude that no departure from our decisions in *Biegenwald* and *Ramseur* is warranted.

### 1. Competency of Hausikima Hubbard to Testify

Hausikima Hubbard, eight years old at the time of trial, was the State's only witness to testify that defendant physically harmed Carolyn Hubbard. Defendant asserts that the trial court conducted an inadequate *voir dire* and thus failed to ascertain the child's competency to testify. Evidence Rule 17 governs the competency of a witness to testify. ("A person is disqualified to be a witness if the judge finds that ... the proposed witness is incapable of understanding the duty of a witness to tell the truth.") The determination of whether a person is competent to be a witness lies within the sound discretion of the trial judge. *State v. R.W.*, 104 *N.J.* 14, 19, 514 *A.*2d 1287 (1986). *State In Interest of R.R.*, 79 *N.J.* 97, 398 *A.*2d 76 (1979). Our review of the record satisfies us that the trial court did not abuse its discretion in allowing Hausikima Hubbard to testify.

### 2. Admissibility of Photographs

Defendant contests the trial court's admission into evidence of the nine proffered photographs depicting the victim's dismembered torso, as at both the guilt and penalty phase of the trial. In admitting the nine photographs the trial court stated:

> [T]he defendant's position is a denial of guilt in all respects. In addition, it is denied or certainly not conceded that the torso in question came from the apartment, was the torso being moved [a]round from place to place in trunks or bags, nor is it admitted that it was the torso of Caroline Hubbard. The place of death and time of death all these are not admitted and are issues in the case. Whether the defendant did or did not do anything with the body is an issue in the case.... The pictures are grotesque and I am sure would be horrifying to the jury.
>
> The problem that I have with ... exclusion is that there are so many issues still alive surrounding this particular alleged homicide and that many of those issues are in part resolvable by consideration of the condition of the torso.

Admissibility of evidence at trial is governed by Evidence Rule 4. "The judge may in his [or her] discretion exclude evidence if he [or she] finds that its probative value is substantially outweighed by the risk that its admission will * * * create substantial danger of undue prejudice or of confusing

the issues or of misleading the jury." *See State v. Thompson,* 59 *N.J.* 396, 420, 283 *A.*2d 513 (1971); *State v. Rose,* 112 *N.J.* 454, 535–36, 548 *A.*2d 1058 (1988). In our view, the trial court did not abuse its discretion in admitting the photographs since they were reasonably related to the identity of the decedent, the time and manner of death, and the ultimate disposition of the corpse. On remand, the trial court shall continue to carefully evaluate the relevance of each photograph to the case, and hence, the admissibility.

3. The Admissibility of Cheryl Hubbard's Unexcised Statement

As recounted above, pursuant to his theory that the defendant did not kill Carolyn Hubbard, defense counsel moved into evidence Cheryl Hubbard's third statement during the guilt phase. That statement indicated that the police were investigating the death of her sister and "the disappearance and possible death of Jackie Cobb." In that statement, Cheryl Hubbard related that Jackie Cobb was present in the apartment with Carolyn Hubbard on the morning of the murder, and Jackie was suffering from two black eyes and a swollen face, because defendant had beaten her severely. She also stated that when she returned to the apartment that morning after buying milk she heard "one of them, either Carolyn or Jackie scream out 'Hashim, no.'" Later, she said, defendant told her that "I don't think that Aisha [Jackie] is going to make it, she has head injuries.... Amira [Carolyn] might make it, but she might tell on what happened." Thus, placing this statement before the jury had the effect of introducing evidence that the defendant had beaten and killed Jackie Cobb as well as Carolyn Hubbard.

The prosecutor objected to the admission of this statement as prejudicial to the defendant. The prosecutor pointed out that the references to Jackie Cobb's presence were deliberately left out of Cheryl Hubbard's guilt-phase testimony to avoid precisely the kind of prejudice that the defense counsel was now

engendering. The court overruled the prosecutor's objection, having satisfied itself that the defense counsel's decision to enter the statement into evidence was a tactical one, designed to show the jury that "the statements in the August 23rd statement were exaggerated and [she] was now making up an incredible tale."

Defendant now asserts that the admission of Cheryl Hubbard's unexcised third statement into evidence suggesting that defendant had committed other crimes unduly prejudiced him, in violation of his due-process right to a fair trial and Evidence Rule 55. Because we find that defendant rendered ineffective assistance of counsel, we do not consider whether Carolyn Hubbard's unexcised third statement, admitted as essential to defense counsel's strategy, prejudiced the defendant. On remand, taking into account the new defense counsel's strategy, the trial court should continue to exercise its discretion to guard against the admission of evidence of other crimes which are prejudicial to the defendant and of minimal relevance. *See State v. Garfole*, 76 *N.J.* 445, 388 *A.*2d 587 (1978); *State v. Atkins*, 78 *N.J.* 454, 396 *A.*2d 1122 (1979).

4. Diminished Capacity Defense

Cheryl Hubbard's third statement, introduced into evidence by the defendant, contained testimony that defendant had been freebasing cocaine the night before the murder, and was a habitual drug user. Throughout the guilt phase of the trial, however, defense counsel vehemently insisted that drug use was not an issue in the case since his theory underlying the submission of Cheryl Hubbard's third statement was that it was false. Hence, the trial judge did not charge the jury on diminished mental capacity. The defendant now argues that the evidence nonetheless justified the issuance of a charge on the defense of diminished capacity, and the trial court's failure to do so constituted plain error.

In *State v. Ramseur, supra*, we recognized that while a trial court has a duty "to charge the applicable law based upon the

facts *regardless* of what requests counsel may make," 106 *N.J.* at 270 n. 62, 524 *A.*2d 188 (citing *State v. Powell,* 84 *N.J.* 305, 318, 419 *A.*2d 406 (1980)), the "injection of [unsolicited jury instructions] by the court [might] enhance the risk of a murder conviction." *Id.* (citing *State v. Choice,* 98 *N.J.* 295, 300–01, 486 *A.*2d 833 (1985)). The facts of this case suggest that defendant might have suffered from a mental disease or defect sufficient to support a diminished capacity defense. However, as discussed at 622, 577 *A.*2d at 469, we hold today that defense counsel rendered ineffective assistance by failing to investigate any evidence to support a diminished capacity defense. Thus, on this record, we do not consider whether the court should have charged the jury on diminished mental capacity. Based on the evidence presented and the theories developed on remand, the trial court shall charge the jury on all applicable defenses.

B. *Additional Issues: Penalty Phase*

1. Aggravating Factor c(4)(c)

Preliminarily, defendant argues that the trial court's pre-*Ramseur* charge with respect to aggravating factor c(4)(c) failed to conform with this Court's narrowing construction of that factor as set forth in *State v. Ramseur,* 106 *N.J.* at 207–11, 524 *A.*2d 188. Because we reverse defendant's conviction and sentence, we do not address the adequacy of the c(4)(c) charge. If there is a retrial, the court shall charge the jury in accordance with our decisions in *Biegenwald* and *Ramseur.*

Defendant also contends that there was insufficient evidence of aggravated battery, torture, or depravity of mind to submit factor c(4)(c) to the jury. We disagree. In *Ramseur,* we stated that torture or aggravated battery will be found "if the defendant intended to cause, and did in fact cause, *severe* physical or psychological pain or suffering to the victim, prior to the victim's death, 'severity' measured either by the intensity of the pain, or the duration of the pain, or a combination of both." *State v. Ramseur,* 106 *N.J.* at 211, 524 *A.*2d 188

(emphasis added) (footnotes omitted). On this record, a properly charged jury could have concluded from Cheryl Hubbard's and Hausikima Hubbard's testimony that Carolyn Hubbard's murder was accompanied by an aggravated battery or torture. Moreover, in *Ramseur* we also stated that post-death mutilation may evidence depravity of mind, when "the murderer intend[s] to do physical damage to a corpse and that when the harm is done the murderer [has] intended that it be done specifically on a corpse." *State v. Ramseur, supra,* 106 *N.J.* at 209 n. 37, 524 *A.*2d 188. On this record, a properly-charged jury might have concluded that the defendant's dismemberment and transportation of Carolyn Hubbard's body was an act of depravity. On remand, the trial court should submit to the jury only those c(4)(c) elements that find support in the record.

2. Alleged Errors Concerning Aggravating and Mitigating Factors

The State's burden of proof, although discussed in the Court's charge was not reflected on the jury verdict sheet. Defendant argues that such omission is contrary to our decision in *State v. Biegenwald, supra,* 106 *N.J.* at 62, 524 *A.*2d 130 ("[A]s a matter of fundamental fairness, the jury must find that the aggravating factors *outweigh* the mitigating factors, and this balance must be found beyond a reasonable doubt."). In *Biegenwald,* we remanded because "neither the court nor the verdict form instructed the jury that for the death penalty to be imposed, the state must prove the requisite balance *beyond a reasonable doubt*". *Id.* at 62, 524 *A.*2d 130. Unlike *Biegenwald,* however, the Savage court instructed the jury that to impose death it must find, beyond a reasonable doubt, that the aggravating factor outweighed the mitigating factor. On remand, the trial court shall continue to ensure that the jury is informed of its burden of proof in the balancing process. Defendant also alleges that the trial court failed to explain adequately the meaning of the proffered mitigating factors and the correct method of weighing them. In the event of a retrial, the court should conform the charges to the requirements set

forth in *State v. Ramseur, supra,* 106 *N.J.* at 292–99, 524 *A.*2d 188; *State v. Bey,* 112 *N.J.* 123, 156–71, 548 *A.*2d 887 (1988) (*Bey II*).

Defendant proffered as a mitigating factor c(5)(f), "the defendant has no significant history of prior criminal activity." Defendant based this proffer on the fact that he had only one prior conviction, a 1981 gun conviction in Connecticut. The jury unanimously rejected this factor. Defendant urges this Court to conduct an independent review of the jury's finding, and to find that this factor exists. We decline to do so. That finding was not against the weight of the evidence, and the jury may again consider it at resentencing.

3. Prosecutor's Summation

Defendant alleges that during summation the prosecutor (1) made misleading comments concerning the jury's role in sentencing; (2) made inflammatory comments concerning the harm that defendant might inflict upon others if released from prison; (3) placed a non-statutory aggravating factor before the jury by arguing that defendant failed to express remorse in his allocution; and (4) told the jury that defendant would appeal, and that it only weighed aggravating and mitigating factors while the judge actually sentenced the defendant. We again emphasize that a prosecutor must confine himself or herself to fair comments on the evidence presented in summation. *State v. DiPaglia,* 64 *N.J.* 288, 304, 315 *A.*2d 385 (1974) (Clifford, J., dissenting). Thus, on remand, the prosecutor's comments should conform to the standards set forth in *State v. Ramseur, supra,* 106 *N.J.* at 319–24, 524 *A.*2d 188, and *State v. Rose,* 112 *N.J.* 454, 518–21, 548 *A.*2d 1058 (1988).

4. Hearsay Testimony at Penalty Phase

Defendant called Eugene McLucas, an acquaintance from Essex County Jail, as a witness during the penalty phase. When defense counsel asked: "Would you tell the jury what you know of Cheryl Hubbard?", the trial court sustained an

objection as "double hearsay" because McLucas conceded that he did not know Cheryl Hubbard. Rather, he explained that his "girlfriend's sister spoke of her and my girlfriend." Defense counsel then asked whether McLucas had "ever spoken to Mr. Savage about Ms. Hubbard", the court again sustained an objection on hearsay grounds. The record does not reveal the scope or substance of McLucas' testimony.

In *State v. Davis*, 96 *N.J.* 611, 477 *A*.2d 308 (1984), we acknowledged that although a sentencing judge may exercise far-ranging discretion with respect to the sources and types of evidence admissible at sentencing, we also emphasized that "in the sentencing phase of a capital proceeding—a life or death contest—a defendant is entitled to use all reliable, helpful information." *Id.* at 619, 477 *A*.2d 308. Moreover, we determined that when defendant offers evidence of a mitigating factor, any doubts concerning admissibility must be resolved in favor of the defendant. *Id.* at 620, 477 *A*.2d 308 (footnote omitted). Thus, on remand, the testimony of Eugene McLucas, if demonstrated to be relevant to any mitigating factor, should be admitted at the penalty phase of the trial.

The judgment of conviction for capital murder is reversed, and the cause is remanded to the Law Division for a new trial.

HANDLER, J., concurring in part and dissenting in part.

Defendant, Roy Savage, was tried and convicted of the murder of Carolyn Hubband and sentenced to death for the crime. The Court holds that defendant received constitutionally-deficient representation at both phases of his capital trial. I concur with the Court's judgment on that issue, but would employ a *per se* analysis. Additionally, I disagree with the Court's conclusion that in the event of a retrial, the *N.J.S.A.* 2C:11-3c(4)(c) aggravating factor may be resubmitted to a jury. I write separately to explain my views on these points. Additionally, I reaffirm my position that New Jersey's Capital Murder Act, *N.J.S.A.* 2C:11-3 possesses fatal constitutional flaws that

pervade and contaminate the entire scheme. *See, e.g., State v. DiFrisco,* 118 *N.J.* 253, 284–285, 571 *A.*2d 914 (1990) (Handler, J., dissenting and concurring).

I.

Under the *Strickland* test for assessing a defendant's claims of ineffective assistance of counsel there must be an initial showing that defense counsel's performance fell outside "the wide range of reasonable professional assistance" such that "counsel was not functioning as the 'counsel' guaranteed ... by the Sixth Amendment;" if that showing is made, the defendant must next show that counsel's incompetence affected the result of the proceeding to a reasonable probability. *Strickland v. Washington,* 466 *U.S.* 668, 104 *S.Ct.* 2052, 80 *L.Ed.*2d 674 (1984). We have invoked a similar test under the State Constitution, *State v. Fritz,* 105 *N.J.* 42, 519 *A.*2d 336 (1987), and use that standard to determine the constitutional entitlement to effective assistance of counsel in capital-murder prosecutions. *State v. Davis,* 116 *N.J.* 341, 561 *A.*2d 1082 (1989). Under prevailing constitutional standards, a defendant is relieved of the second showing where the sixth-amendment violation occasioned by counsel's ineffectiveness is "so likely to prejudice the accused that the cost of litigating [the] effect in a particular case is unjustified." *United States v. Cronic,* 466 *U.S.* 648, 659, 104 *S.Ct.* 2039, 2047, 80 *L.Ed.*2d 657, 668 (1984). I believe counsel's ineffectiveness in this case was so horrific that it would be a travesty to require further inquiry to determine whether it was seriously prejudicial.

Defendant was sentenced to die for the crime he committed. His attorney saw him only once before his trial. The Court expressly recognizes the gravity of the professional derogation when a criminal defendant is visited only once prior to trial by defense counsel. It concedes that in most instances that circumstance would warrant the *Cronic per se* analysis. At 616, 577 *A.*2d at 466. The Court believes that this is not such a

case, however, because of assertions by defense counsel that he "communicated with [defendant] at least fifteen to thirty times by telephone." *Id.* at 617, 577 *A.*2d at 466. "[C]onsidering all of counsel's communications with defendant," the Court finds "that defendant was not so distinctly prejudiced as to warrant the *per se* analysis." *Ibid.* It explains that "it is not the frequency of consultation that reveals whether a defendant has been effectively denied effective legal assistance [but rather] whether as a result of that consultation, counsel was able properly to investigate the case and develop a reasonable defense." *Ibid.*

The Court's view of counsel's shortcomings is overly indulgent. I believe that defense counsel's incompetence in this case amounts to the constructive denial of any representation at the critical preparatory stage of the prosecution and thus compels the *Cronic* presumption of ineffectiveness. Although the Court relies on the numerous pretrial telephone conversations alleged to have occurred, counsel could not relate the content of those conversations, and in fact could only affirm that he "probably" discussed trial strategy with defendant.

Additionally, the Court's narrow focus on one aspect of the interaction between counsel and client obscures the broader failings of counsel. In the face of extremely damning evidence, including an inculpatory statement by his client regarding the suitcase found to contain the corpse, defense counsel failed to pursue even the most basic methods of information gathering, alone or with assistance, or to conduct any form of investigation beyond a "few beers" in a Newark bar, which solitary tactic proved fruitless. As the Court recounts, counsel retained no experts or investigators, preferring to "work alone," could not conceive of discussing the case with defendant's prior counsel, and dismissed mental-health defenses despite obvious and ominous indications that they would be feasible. At 610–612, 577 *A.*2d at 463–464.

That the "reasonable doubt defense" pursued by counsel at the guilt phase of this case was arrived at by default is undeniable. Without the benefit of any independent assessment or testing of proposed testimony by the State's witnesses, trial counsel conceived that a viable position was that the State would fail to prove its case beyond a reasonable doubt. Indeed the only affirmative presentation made by defense counsel at the guilt phase was to place before the jury as *harmful* a piece of evidence as any produced by the State, and vehemently to oppose redaction—Cheryl Hubbard's third statement detailing defendant's extensive drug use and an additional probable victim.

Nevertheless, the Court concludes that the deficiencies of counsel's performance at the guilt phase, entailing no investigation, preparation or formulation of affirmative strategies, were somehow less than presumptively devastating to defendant's cause. Yet, as the Court acknowledges,

[i]n a capital trial, where strategy is crucial to the life-or-death determination, the need for adequate pretrial consultation becomes paramount. In the present case, however, defense counsel neglected to make relevant, and in fact critical, inquiries during his pre-trial consultations with defendant.
[At 620, 577 *A*.2d at 468.]

The record reveals an abundance of attorney lassitude and ineptitude in defending against the State's case. This is not a case in which counsel was actively assisting defendant, deserving of the *Strickland* presumption that tactical decisions fall "within the wide range of reasonable professional assistance." 466 *U.S.* at 689, 104 *S.Ct.* at 2065, 80 *L.Ed.*2d at 694. This attorney failed to make any tactical decisions. *See Silverson v. O'Leary,* 764 *F.*2d 1208, 1216 (7th Cir.1985) ("The crucial premise on which the *Strickland* formula rests—that counsel was in fact assisting the accused during the proceedings and should be strongly presumed to have made tactical judgments 'within the wide range of professional assistance'—is totally inapplicable when counsel was absent from the proceedings and unavailable to make any tactical judgments whatsoever"). As Justice Brennan noted in concurrence in *Strickland:*

[C]ounsel's incompetence can be so serious that it rises to the level of a constructive denial of counsel which can constitute constitutional error without any showing of prejudice. See *Cronic,* ante, [466 *U.S.*] at 659–660, 80 *L.Ed.*2d 657, 104 *S.Ct.* 2039 [2046–47]; *Javor v. United States,* 724 *F.*2d 831, 834 ([9th Cir.] 1984) ("Prejudice is inherent in this case because unconscious or sleeping counsel is equivalent to no counsel at all").

[466 *U.S.* at 704 n. 2, 104 *S.Ct.* at 2073 n. 2, 80 *L.Ed.*2d at 704 n. 2 (Brennan, J., concurring).]

Where, as here, "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable." *United States v. Cronic, supra,* 466 *U.S.* at 659, 104 *S.Ct.* at 2047, 80 *L.Ed.*2d at 668 (1984); *see also United States v. Thomas,* 856 *F.*2d 1011, 1017 (7th Cir.1988) (counsel's failure to file an appellate brief on defendant's behalf "meant no representation at all" at critical stage and presumptively prejudiced defendant); *Silverson v. O'Leary, supra,* 764 *F.*2d at 1216 (jury deliberations and return of the verdict are critical trial stages; "like the 'denial of assistance altogether,' ... [this] constitutes a discrete situation that must be considered at least likely to result in prejudice to the defendant); *Javor v. United States,* 724 *F.*2d 831, 833–34 (9th Cir.1984) (where attorney sleeps through substantial portion of trial, "prejudice is inherent ... because unconscious or sleeping counsel is equivalent to no counsel at all.").

Likewise, with respect to the penalty phase of the trial, the Court examines counsel's performance under the two-prong *Strickland* test, concluding that it was deficient and, further, that had he presented "additional information ... regarding defendant's mental state, there is reasonable probability that a jury would have concluded that 'the balance of aggravating and mitigating factors did not warrant death.' " At 626, 577 *A.*2d at 471. Again I believe the majority undertakes an unnecessary and unwise second step before concluding that defendant was denied adequate representation.

There is no more critical proceeding from a defendant's, and indeed society's, point of view than a capital-sentencing trial.

Here there was a complete and total forfeiture both in preparation and presentation of defendant's side, resulting in a breakdown of the structured adversarial capital-sentencing scheme. The Court's commitment to the heightened level of protection afforded capital defendants is indispensable in assuring the reliability of the determination that eventuates in guilt and the death penalty. Consistent with this commitment, the Court cannot countenance in any respect attorney performance of this caliber.

Again, justification for counsel's inertia cannot rest on strategic or tactical grounds. The argument made by trial counsel following the guilty verdict demonstrates forcefully the absence of any such tactical justification. Counsel advised the court that he was unready and that the case could not proceed to a second phase because he had not yet been served with a renewed Notice of Aggravating Factors pursuant to the superseding indictment. The trial court rejected that contention, remarking, "it boggles my mind that you have not prepared for the possibility ... of a hearing with respect to the death penalty in a case which is a death penalty case." Counsel responded that "[i]t certainly [came] as a surprise" to him; when the court asked how many witnesses he planned to offer, defense counsel replied, "none."

Counsel ultimately used two witnesses, defendant's wife and mother-in-law, and contended that five mitigating factors justified a life sentence. However, neither witness offered the jury much more than personal opinions of the defendant. Thus, this is not a case in which defense counsel made an informed decision not to present mitigating evidence, see *State v. Davis, supra,* 116 *N.J.* at 409–12, 561 *A.*2d 1082 (Handler, J. dissenting) (discussing cases involving the failure to present mitigating evidence). Here, complete reliance was placed on a perceived technical error made by the State. See *Mitchell v. Kemp,* 483 *U.S.* 1026, 1031, 107 *S.Ct.* 3248, 3252, 97 *L.Ed.*2d 774, 778 (1987) (Marshall, J., dissenting from denial of certiorari) (reliance on similar "ace in the hole" strategy to avoid sentencing hearing,

combined with failure to prepare case in defense, "is not strategic at all; it is incompetent."). As the Court notes,

[b]y failing to inquire into the very facts that could support his case in mitigation, counsel's performance "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington, supra,* 466 *U.S.* at 686, 104 *S.Ct.* at 2064, 80 *L.Ed.*2d at 692–93. Unlike the attorney in *Burger v. Kemp, supra,* who investigated defendant's history, interviewed potential witnesses and examined defendant's psychiatric reports, Savage's counsel did not make a "reasonable decision that his client's interests would not be served by presenting [additional mitigating] evidence." 483 *U.S.* at 791, 107 *S.Ct.* at 3124, 97 *L.Ed.*2d at 655.

[At 624, 577 *A.*2d at 470.]

In short, the failure to investigate coupled with the evidence of defendant's serious mental and emotional disorders and his probable drug use on the night of the murder, as well as a general lack of preparation, obviates the need for any further search for reversible prejudice. In my view, counsel's failings make it unnecessary to search the record for a reasonable probability of prejudice. Counsel's desultory representation was tantamount to no representation at all.

This case also demonstrates that the level of competence sufficient for general criminal defense work cannot satisfy the heightened fair-trial standards that apply to capital-murder prosecutions. Capital counsel must be held to an exacting standard of competence. The Court declined to test counsel's performance by a more stringent level of expertise in *State v. Davis,* explaining:

[W]e do not feel impelled to adopt stricter standards for judging constitutional rights in capital cases than in noncapital cases. To judge capital defendants differently would effectively diminish the rights of noncapital defendants, a disquieting result that we reject. There either is a constitutional violation or there is not. There can be no double standards. At the same time, we have committed ourselves to a searching and stringent review of capital records, which, we believe, coupled with an enhanced application of the harmless error standard, would be "sufficiently flexible to accommodate our heightened concerns and responsibilities in reviewing death-penalty prosecutions." *State v. Bey,* 112 *N.J.* 45, 95; 548 *A.*2d 846 (1988)....

[116 *N.J.* at 356, 561 *A.*2d 1082.]

Instead the Court simply included within the competence prong of the test "expertise regarding the special considerations present in capital cases." *Id.* at 356, 561 *A.*2d 1082.

In *Davis*, I registered my belief that capital defendants are *constitutionally* entitled to advocates of the highest caliber, and that an appellate court must employ "an enhanced standard by which to measure the competence of counsel and the degree of prejudice sufficient to find a violation of the right to such assistance." 116 *N.J.* at 404–05, 561 *A.*2d 1082 (Handler, J., dissenting).

> I believe the "special considerations present in capital cases" demand specialized competence on the part of counsel. Counsel in these cases must provide competence grounded in experience, training, and professional skill that will suffice to provide a defendant with the full measure of all the heightened protections a capital-murder prosecution engenders. It is not sufficient to define the professional competence required in a capital-murder prosecution as one that is "reasonable" in terms of an average attorney or is measured by the "task to be accomplished." These definitions carry no intrinsic meaning or objective guidance.
>
> [*Id.* at 402, 561 *A.*2d 1082 (Handler, J., dissenting).]

The Court's confidence that the standard endorsed in *Davis* will achieve the levels of professional representation demanded in capital proceedings is ill-founded. Certainly the professional challenges in this case, as in all capital-murder prosecutions, were fundamentally different from those in an ordinary criminal case. The task confronting counsel came in the form of a myriad of complexities, substantive and procedural, that characterize virtually all death-penalty trials. They commence with the indictment, pretrial events, jury selection, and continue through two sequential trials that have distinctively different functions yet are predicated on overlapping evidence. In this case, counsel's ineptitude with respect to the nuances of capital litigation is obvious. An example suffices: during deliberations the jury asked the court whether it had to be unanimous on mitigating factors, to which the court proposed a charge that explained that any juror who found a factor should consider it in the weighing process. After extended objection from defense counsel, the court simply responded "no," leaving the

jurors free to assume that a majority would control the outcome on any mitigating factor. Yet in finding defendant's constitutional rights violated, the Court fails to identify any deficiency in counsel's performance uniquely related to the fact that this was a death-penalty trial.

Defense counsel's representation fell far below the rudimentary sixth-amendment guarantees afforded any criminal defendant. In capital cases a finding of incompetence to that degree should be enough to render representation insufficient under the State Constitution, because irrespective of the actual prejudice inflicted on the defendant, his fair trial rights, heightened in death-penalty cases, were infringed. See *State v. Williams*, 93 *N.J.* 39, 61, 459 *A.*2d 641 (1983) (importance of fair-trial requirements heightened in death cases). The American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, reflections of "prevailing norms of practice" and "guides to determining what is reasonable," *Strickland v. Washington, supra,* 466 *U.S.* at 688, 104 *S.Ct.* at 2064, 80 *L.Ed.*2d at 694, and referred to by the Court, recognize the distinction between capital and noncapital prosecutions:

> The quality of counsel's "guiding hand" in modern capital cases is crucial. At every stage of a capital case, counsel must be aware of specialized and frequently changing legal principles and rules, and be able to develop strategies applying them in the pressure-filled environment of high-stakes, complex litigation.
>
> [Commentary to Guideline 1.1.]

In response to these circumstances the ABA recommends that no less than two highly-qualified attorneys be appointed to represent each capital defendant. Commentary to Guideline 2.1.

I do not disagree with the Court's final conclusion that defendant was prejudiced at the guilt phase of his capital trial because the ample evidence of defendant's bizarre behavior and serious mental problems, if properly marshalled, would have more than likely resulted in a different verdict. Likewise, the Court concludes, "if defense counsel had presented additional

information at the penalty phase regarding defendant's mental state, there is a reasonable probability that a jury would have concluded that 'the balance of aggravating and mitigating factors did not warrant death.' " At 626, 577 *A*.2d at 471 (citation omitted). I believe, however, the focus of the constitutional analysis in capital-murder prosecutions should remain on defense counsel's competence and the degree to which it fails to measure up to the exacting levels of proficiency that must be achieved by attorneys protecting persons from the State's efforts to put them to death.

## II.

This case was rendered capital by the State's allegation of one statutory aggravating factor, *N.J.S.A.* 2C:11–3c(4)(c). To prove that factor the State relied on the evidence adduced at the guilt phase. The jury found all three aspects of the factor present—that is, aggravated battery, torture, and depravity. The Court concludes that in the event of a re-conviction of knowing or purposeful murder, the State may re-present aggravating factor c(4)(c) to the jury. The Court explains:

On this record, a properly charged jury could have concluded from Cheryl Hubbard's and Hausikima Hubbard's testimony that Carolyn Hubbard's murder was accompanied by an aggravated battery or torture.

\* \* \* \* \* \* \* \*

On this record, a properly-charged jury might have concluded that the defendant's dismemberment and transportation of Carolyn Hubbard's body was an act of depravity.

[At 636, 577 *A*.2d at 476.]

The evidence the Court finds sufficient to support aggravated battery or torture is as follows: an eyewitness to defendant's scraping the victim's ear with a nail file on the morning of the alleged murder, and Cheryl Hubbard's recollection of hearing a female scream "Hashim, no!" that same morning. The finding of depravity involves post-death mutilation of the victim.

I believe the evidence is insufficient to permit resubmission of any component of the c(4)(c) factor to a subsequent delibera-

tion. As echoed many times in the Court's capital cases since the factor was narrowed in *State v. Ramseur*, 106 *N.J.* 123, 209, 524 *A.*2d 188 (1987), "the essence of the legislative concern is the defendant's state of mind."

"Torture" and "aggravated battery" take on adequate definiteness when the circumstances are described in terms of defendant's intention, and the requirement that defendant intentionally inflicted extreme physical or emotional pain eliminates the need for a distinction between the two statutory terms.

The Court's construction was not advisory—it was constitutionally compelled. Therefore no finding of sufficiency can be made without evaluating the proofs surrounding *intent*. As to aggravated battery or torture, here there was none. Surely our system of jurisprudence requires that such a failure of proof on the State's part inure to the benefit of the defendant. "[A] court ... should not [ ] instruct a jury to return a verdict that would clearly be unwarranted by the record." *State v. Crisantos (Arriagas)*, 102 *N.J.* 265, 273, 508 *A.*2d 167 (1986). Likewise to allow the State to attempt to produce new evidence runs counter to "fundamental double jeopardy principles." *State v. Biegenwald*, 106 *N.J.* 13, 51, 524 *A.*2d 130 (1987).

Similarly, this record discloses that defendant's clear purpose in dismembering Carolyn Hubbard's body was to dispose of it without being detected. As Cheryl Hubbard stated, defendant asked her what he should do with the body, to which she responded, "put it in a box and take it somewhere." He then carted it around in a suitcase before abandoning it at the Newark projects. That purpose contradicts the definition of depravity of mind consisting of post-death mutilation inflicted for self-pleasure. *See State v. Davis, supra,* 116 *N.J.* at 395–400, 561 *A.*2d 1082 (Handler, J. dissenting) (some nexus between homicidal act and mutilation must be established).

It is unprincipled for the Court to expose a defendant to death in the absence of evidence that could legitimately enable a jury to determine beyond a reasonable doubt that the killing was accompanied by an intent to torture or a depraved mental state. Without such evidence, a jury's determination of punish-

ment is inherently speculative, its death sentence wholly unreliable.

## III.

I would reverse defendant's conviction and sentence and remand for a noncapital retrial.

*For reversal and remandment* —Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—6.

*Concurring in part; dissenting in part* —Justice HANDLER—1.