**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3764-22

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

MARIO FIGUEROA, a/k/a
ALMIGHTY FIGUEROA,
and MICHAEL FIGUEROA,

     Defendant-Appellant.

_____

        Submitted April 30, 2025 – Decided July 29, 2025

        Before Judges Marczyk and Paganelli.

        On appeal from the Superior Court of New Jersey, Law Division, Monmouth County, Indictment No. 16-04-0739 and 16-07-1233.

        Jennifer N. Sellitti, Public Defender, attorney for appellant (Monique Moyse, Designated Counsel, on the brief).

        Raymond S. Santiago, Monmouth County Prosecutor, attorney for respondent (Monica do Outeiro, Assistant Prosecutor, of counsel and on the brief; Olivia Christy,

Legal Assistant, appearing pursuant to Rule 1:21-3(a), on the brief).

PER CURIAM

Defendant Mario Figueroa appeals from a June 26, 2023 order denying his petition for post-conviction relief (PCR) without an evidentiary hearing. Based on our careful review of the record and the application of well-established law, we conclude defendant failed to establish a prima facie claim for ineffective assistance of trial counsel and affirm.

We are familiar with this matter as we affirmed defendant's convictions on direct appeal. See State v. Figueroa, No. A-3784-17 (App. Div. July 8, 2020). We recite the following from our prior opinion to provide procedural and factual context:

> Defendant was charged under Indictment No. 16-04-0739 with first-degree armed robbery of Christopher Perricone, N.J.S.A. 2C:15-1 (count one); fourth degree unlawful possession of a knife, N.J.S.A. 2C:39-5(d) (count two); third-degree possession of a knife for an unlawful purpose, N.J.S.A. 2C:39-4(d) (count three); first-degree tampering with witness Kirk Charlton, N.J.S.A. 2C:28-5(a) (count four); second-degree retaliation against Charlton, N.J.S.A. 2C:28-5(d) (count five); and second-degree aggravated assault upon Charlton, N.J.S.A. 2C:12-1(b)(1) (count six). Defendant also was charged under Indictment No. 16-07-1223, with first-degree tampering with witness Ivonne Robinson, N.J.S.A. 2C:28-5(a) (count one).

2

Before the trial, the victim died of causes unrelated to the robbery.

. . . [D]efendant asked the judge to review a recording a police officer made using his Mobile Video Recorder (MVR).

The recording was made during the show-up procedure, which took place shortly after the robbery was committed. The victim observed defendant and Robinson and stated they were not the persons who robbed him.

The judge stated that he would listen to the evidence and then rule on the motion. Defendant repeatedly interrupted the judge and insisted that the MVR recording showed he did not commit the robbery. . . .

. . . .

Defendant stated that he had a right to call witnesses and he was "going to need the victim, because he's in my favor." The judge told defendant the victim could not be called because he was deceased. Defendant said the judge would have to dismiss the charges.

The case was scheduled for trial before another judge. At a pretrial conference, defendant asked the trial judge if he had the right to confront the "alleged victim in this case or not." The judge stated that defendant would not be permitted to engage in disruptive conduct before the jury. Defendant was removed from the courtroom.

The judge then ruled on several motions. The judge determined that if defendant elected to testify, his

3

prior convictions would be admissible for impeachment. The judge also determined that the MVR recording of the show-up would not be admitted because the victim's statements were hearsay and not admissible under the hearsay exception for excited utterances.

At the trial, Sean DeShader of the Asbury Park Police Department (APPD) testified that on October 21, 2014, he and two other officers were on patrol in a marked police vehicle. DeShader stated that at around 9:00 p.m., as they were traveling north on Main Street, they observed two individuals running across the street at the corner of Main Street and Sewall Avenue. DeShader recognized the individuals and identified them as defendant and Robinson. Defendant and Robinson ran north on Main Street and turned left onto Asbury Avenue.

According to DeShader, defendant was moving fast and Robinson was "trying to catch up." The officers stopped their vehicle, stepped out, and approached defendant and Robinson. DeShader said they decided to stop because defendant and Robinson were in a high-crime area, where there had recently been robberies, and because defendant and Robinson were "fleeing across the street" disregarding traffic.

When the officers approached, defendant slowed down. Robinson stopped abruptly and then began to walk. DeShader observed a black object fall from her right side. He noticed it was a wallet. DeShader picked it up and opened it. The wallet contained a driver's license, issued in Perricone's name, with a photograph of a white male with brown hair. The wallet also contained a health card and Perricone's credit card.

4

DeShader approached Robinson and she agreed to speak with him. DeShader brought Robinson to the location where the other officers were questioning defendant. DeShader told the officers about the wallet. DeShader then returned to the route defendant and Robinson had taken. He observed an individual who looked like the man whose picture appeared on the driver's license.

The man was sitting in the window of a restaurant, which was near the corner from which the suspects began to run. DeShader testified that the man had blood coming down the side of his face, and he was complaining to another patron about having been robbed. DeShader identified himself and showed him the wallet. The man confirmed he was Perricone and that the wallet belonged to him.

Perricone told the officer what had happened. DeShader testified that Perricone "seemed out of it, like, when you get hit pretty good." DeShader said Perricone had an injury to his eye, a wound to the right side of his forehead, lacerations to the right side of his eye, and a gash on his nose that was bleeding. He also had abrasions on the palms of his hands, and an abrasion on the back of his fists.

The officers continued their investigation. They walked to a store which was near the corner from which the suspects began to run and observed surveillance cameras. DeShader checked the angles of the cameras to determine whether they could have captured footage of the robbery. As he was doing so, Charlton approached him. DeShader said he knew Charlton because he had dealt with him previously "on the streets." Charlton told DeShader "[defendant] robbed that white boy." Charlton agreed to come to police headquarters to provide a statement.

5

DeShader returned to the APPD headquarters. When he arrived, he noticed Charlton was there with an acquaintance, David Edwards, who also had been present at the time of the robbery. Charlton and Edwards provided Detective Daniel Kowsaluk with statements. Robinson also provided a statement.

At trial, Robinson admitted she and defendant committed the robbery. She testified that someone told them the victim had cash. She narrated the surveillance video of the incident as it was played for the jury. She noted that defendant approached "the guy" and tried to persuade him to purchase drugs. She and defendant began to walk with the victim and then robbed him. Later, the police arrested her and she was incarcerated in the county jail.

Robinson said defendant was in the county jail at the time and he wrote to her every day. Sometime in early 2016, after the victim died, Robinson agreed to cooperate with the prosecutors. She testified around that time, defendant's letters to her became threatening. In one of his letters, defendant stated, "If you go against me, you will make the biggest mistake in your life." He also wrote that he could not believe she could be "this weak and stupid" and cursed her.

In February 2016, Robinson pleaded guilty to second-degree conspiracy to commit robbery, and the State agreed to dismiss two other charges pending against her. When Robinson pleaded guilty, defendant wrote to her. He called her a "dumb ass" and said she "stepped all on [his] heart."

In that letter, defendant broke up with Robinson and stated, "May you live forever. It's over now." Robinson testified that she perceived this remark as a threat. She wrote back and told defendant she would

6

withdraw her plea. Thereafter, defendant prepared papers for Robinson to withdraw her plea and forwarded them to her.

Robinson said she signed the papers because she felt threatened, pressured. She stated that she "was just doing it so [defendant] could leave her alone." However, after she submitted the papers for filing, Robinson called her attorney and told him she did not want to withdraw her plea. She said she had filed the motion because defendant pressured her.

Edwards testified that on October 21, 2014, at around 9:00 p.m., he was with Charlton at the corner of Main Street and Sewall Avenue, which was near a liquor store. He saw defendant and Robinson walk by. He said he had known defendant for a long time. Defendant crossed the street, and Edwards saw him speaking with a white man. Edwards went into the liquor store. When he came out, he saw defendant and Robinson running across the street.

Charlton testified that on October 21, 2014, at around 9:00 p.m., he was with Edwards on the corner of Main Street and Sewall Avenue. He saw a person named Carl with a white man. Charlton then observed defendant and Robinson approach the two men. Carl left and defendant spoke with the other man. Charlton saw defendant grab the man as Robinson went into the man's pocket. According to Charlton, defendant threw the man to the ground and took off. Charlton called DeShader and reported the incident.

Charlton further testified that sometime in June 2015, he and defendant were incarcerated in the county jail. Charlton said that in the jail, defendant ambushed him. According to Charlton, defendant "just started wailing" on him and "beat him senseless." Charlton

7

said defendant told him, "every time I see you, I'm going to get you because you know you snitching on me and my girl."

Charlton stated that six officers were required to stop the assault. As the officers were taking defendant away, defendant told Charlton, "every time I see you, man, I'm going to get you man. I'm going to get you, man. I'm going to kill you." A security camera recorded the incident.

The jury found defendant guilty on all charges.

[Id. at 3-10 (alterations in original).]

In the direct appeal, among other arguments, we considered defendant's argument that the MVR recording should have been admitted in evidence. Id. at 10, 11, 13. We stated we "[we]re convinced the record support[ed] the judge's findings and his conclusion that the victim's statement on the MVR recording w[as] not excited utterances under [N.J.R.E.] 803(c)(2)." Id. at 15-16. Therefore, we concluded "[t]he judge did not err by denying defendant's application to admit the MVR recording into evidence." Ibid. In addition, we held,

> even if the judge erred by refusing to admit the MVR recording, reversal of defendant's convictions is not warranted because the error is harmless. Because the State presented overwhelming evidence showing that defendant committed the charged offenses, the claimed error was not "sufficient to raise a reasonable doubt as

to whether" the error "led the jury to a result it otherwise might not have reached."

[Ibid.]

Defendant filed a petition for PCR. In part, he claimed:

2. Prior to my trial, my attorney never prepared me to testify in my own defense. I wanted to testify at my trial, but because my attorney never prepared me to do so, I did not even understand the benefits of doing so.

3. In my case the victim stated, right after the robbery occurred, that I was not the person that committed the crime. However, because he died before my trial I was not able to have the jury hear his statement of my innocence.

4. I did not realize that even though the court had denied my motion for the victim's statement to be admitted, I could still have testified to things that I had personal knowledge about. Specifically, I could have testified about how right after the robbery I was arrested by the police and that the victim was brought over to look at me. I could have further testified that immediately following this "show up" I was released by the officers and not charged with any crime. Yet, my attorney never explained these things to me.

5. In addition, I wanted to tell the jury that I was innocent of the crime against me. I wanted to tell the jury that I had never committed a robbery or a theft against this person. However, my attorney never prepared my testimony or gave me any information about how direct and cross[-]examination works during a trial. Accordingly, when I was suddenly asked by the court if I was going to testify I did not know what to say.

9

6. I initially told the court my attorney had not prepared me. However, the judge said I had to provide an answer. So, because my attorney had not prepared me to testify I answered no.

The trial transcript reveals the following exchange regarding defendant's decision not to testify:

THE COURT: . . . the State is resting. [Defense counsel], other than your client, do you have any witnesses?

[DEFENSE COUNSEL]: I do not, your Honor.

THE COURT: Have you discussed with your client his election in whether or not to testify?

[DEFENSE COUNSEL]: I have, your Honor. I have talked to him previous to today, as well as this morning in the holding area. I did discuss with him your Honor's ruling in the Sands/Brunson[1] issue because in that proceeding, of course [defendant] was escorted out of the courtroom. I did advise him what your ruling was that essentially all his prior criminal convictions will be coming in if he chooses to testify. However, all of those prior convictions would be sanitized, so any of the nature of the offense would not be brought in against him.

I have advised him of his right to testify. I did advise him that your Honor will be questioning him about that this morning. He's indicated that he -- when I asked him if he does, in fact, want to testify, he said

---

[1] "When deciding whether to admit a witness's prior conviction, trial courts hold a Sands/Brunson hearing." State v. Higgs, 253 N.J. 333, 368 (2023) (citing State v. Sands, 76 N.J. 127 (1978); State v. Brunson, 132 N.J. 377 (1993)).

he did not know. He would let me know when he talks to you.

When he came in here a few moments before you took the bench, I asked him if he, in fact, made his decision as to whether or not he wanted to testify. He's indicated that he still doesn't know at that point, so I don't know whether or not he wants to testify or not.

THE COURT: All right. And you have indicated to him that I'm obligated to go over his rights with him, right?

[DEFENSE COUNSEL]: Yes, I did, Judge.

THE COURT: Okay. All right. [Defendant], let me ask you, I'm going to ask you a few questions. I'm going to ask you to pay attention. Listen to what I'm saying and at some point I'm going to ask you certain questions; do you understand that?

DEFENDANT: Are we on the record, your Honor?

THE COURT: Yes, we are.

DEFENDANT: This is for the record?

THE COURT: I'm sorry?

DEFENDANT: Is this for the record?

THE COURT: This is on the record. It's part of the trial.

DEFENDANT: This is for the record. Okay. I just want to make sure.

11

THE COURT: First advisement is you have the right to remain silent. If you choose to exercise your right to remain silent and you do not testify at trial, the jury cannot hold that against you. If you choose not to testify, I will give the jury the following instruction, please pay close attention. This is what I will tell the jury if you decide that you don't want to testify. I will say this to the jury:

As you know, the defendant has elected not to testify at trial. It is his constitutional right to remain silent. You must not consider for any purpose or in any manner in arriving at your verdict the fact that the defendant did not testify. That fact should not enter into your deliberations or discussions in any manner at any time. The defendant is entitled to have the jury consider all evidence presented at trial. He is presumed innocent whether or not he chooses to testify.

So I just want you to understand if you choose not to testify, that's what I will be telling the jury. Do you understand that?

DEFENDANT: For the record, yes.

THE COURT: Okay. Now, if you choose to testify, you will be subject to cross-examination by the prosecutor and you will have to answer all of the prosecutor's questions. Do you understand that?

DEFENDANT: For the record, yes.

THE COURT: Now, if you refuse to answer a question posed to you by the prosecutor after you have been instructed to do [so], you will be subject to fines and contempt charges. Do you understand that?

DEFENDANT: For the record, yes.

12

THE COURT: And if you refuse to answer any questions on cross-examination by the prosecutor, upon an application I would be inclined to strike your entire testimony from the record. Do you understand that?

DEFENDANT: For the record, yes.

THE COURT: All right. In your case, you do have a prior record. As [defense counsel] has indicated, if you decide to testify, . . . the prosecutor and/or your attorney, if he chooses, you would only be asked about certain information regarding your prior convictions. We call that sanitization.

DEFENDANT: For the record, yes.

THE COURT: That means that the jury [is] only entitled to hear the date [of] your conviction, the degree of the charges of which you were convicted, and the sentence imposed. Do you understand that?

DEFENDANT: For the record, yes.

THE COURT: Do you have any questions on what I have told you so far at this time?

DEFENDANT: I will let you finish, your Honor, then I will speak.

THE COURT: No questions so far?

DEFENDANT: No, I'd rather let you speak and then I will speak.

THE COURT: Okay. Now, have you discussed with [defense counsel about] whether or not you want to testify? I'm only asking you now whether or not you have discussed it with him.

13

DEFENDANT: Did I discuss it with him?

THE COURT: Yes.

DEFENDANT: Did we talk about that? We haven't really talked about anything as far as this case, for the record.

THE COURT: Well, he indicated earlier that he tried to talk to you about it.

DEFENDANT: We haven't really talked about anything, actually, but no, we haven't, but since we are on the topic--

THE COURT: [Defense counsel] indicated earlier that he tried--

DEFENDANT: Is he ineffective? Oh, yes.

THE COURT: That he tried this with you on a number of occasions and you told him that you would wait until we got to court to talk about it. Do you remember having any discussions with him about this downstairs in the holding area?

DEFENDANT: No.

THE COURT: Well, [defense counsel] has placed on the record his recollection.

DEFENDANT: For the record, I never get to find out anything until I get up here, your Honor.

THE COURT: Have you told [defense counsel], whether or not -- have you discussed with your attorney your desire to testify?

DEFENDANT: No.

THE COURT: Have you had enough time to speak with your attorney regarding testifying at trial?

DEFENDANT: No, this is all new to me, your Honor. He never once had brought this to my attention, for the record. Like I said, nothing's ever brought to my attention when it comes to the case until I get up here, your Honor.

THE COURT: All right. That being the case, what is your decision?

DEFENDANT: Well, I just want to say, your Honor, for the record, I'm asking [for an] interlocutory appeal based on the motion to dismiss the charges on the confrontational clause and the dismissal of the indictment for failure to present exculpatory evidence. I have asked my lawyer to request this on my behalf, for the record, but he still remains ineffective allowing for the trial to take place without the State even having to produce the victim of the alleged crime, but not once invoking my Sixth Amendment right during the trial in order for me to have a fair trial, your Honor.

So he doesn't have my best interests, your Honor. We need to -- I asked the [c]ourt, humbly ask the [c]ourt for us to approach this issue in this situation immediately as we speak, your Honor, because he clearly shows that he's conspiring with the State when it comes to representing this case, your Honor, and hopefully this is on the record. I don't know. I'm not too sure with all the --

THE COURT: Everything is on the record.

DEFENDANT: Yeah, well, yeah, I definitely need the interlocutory appeal based on what I just told you, your Honor, because I have asked my attorney about my rights to confront the alleged victim in this case in order for me to have a fair trial. He continued to tell me that I don't have those rights, therefore, he won't speak on them. Just like I don't have the right for a[n N.J.R.E.] 104 evidential hearing[], which is why we never had one. The only thing we ever spoke about was the exculpatory evidence that you excluded. Other than that, no other evidence was ever brought up as far as what could be allowed in, what [can]not can be allowed in which, again, your Honor, is proof that [defense counsel] . . . here, has been very ineffective on my behalf.

I just ask the [c]ourt not to continue to ignore this due process that I'm entitled to under the [c]onstitutional [r]ights, your Honor, and I hope this is really on the record, in order for something to be done about this, your Honor, because nothing has been done. Like I said, he doesn't -- he just basically moving along in this case without even -- which is the reason why I been, I guess the [c]ourt will say acting in an unprofessional manner, the respect that the [c]ourt[] is properly, you know, supposed to be given. You know, as a place of professionalism so, you know, this is the reason why these actions I have, have actually been, you know, the way they are on my behalf through this whole situation.

For what it's worth, for the record, I just want to apologize to you, you know, for the whole situation sincerely and honestly. Like, it's never my intention[] to ever . . . you know, disregard, you know, the authority, your position, your power, or anything like that. You know, it's not even that. It's not none of that, your Honor. It's just like the story of my life, your

16

Honor. Just from one thing to another, man. You know, it's all a learning experience in the same token, man, but it just -- I just need you to consider, taking consideration everything I'm just telling you due to the fact that it's not just coming out of my mouth, but it's coming out of my heart, as well, you know, so like I said, man.

THE COURT: I understand.

DEFENDANT: I just needed representation, I lack a lawyer in this whole situation. The situation for that reason, continued to just free ball, you know, with the whole situation from day one to now. It's just, I never -- I never once in my life, your Honor, possessed a weapon or threw the weapon at anybody or anything like that. I didn't do that.

THE COURT: Well, we're at the point now where I have given you all of your advisements --

DEFENDANT: Yeah.

THE COURT: -- regarding your election to testify. Have you made a decision whether or not you want to testify?

DEFENDANT: Did you hear what I just said about the questions?

THE COURT: I heard every word that you just said.

DEFENDANT: So can you speak on that real quick, your Honor, because that's very crucial to this case, your Honor, because the victim was never even here for me to cross-examine, your Honor, which is by law.

THE COURT: I'm not going to relitigate --

17

DEFENDANT:  I'm invoking --

THE COURT:  The victim is deceased.

DEFENDANT:  -- my Sixth Amendment.  All right then.  So how do we even continue to move forward with the case without a victim even being here to --

THE COURT:  Right now we have to focus on this question.  Do you want to testify or not?

DEFENDANT:  No.

THE COURT:  Okay.  Has anyone forced you to make that decision?  Are you making that decision of your own free will?

DEFENDANT:  For the record, no, no one is forcing me, your Honor.

THE COURT:  All right.

DEFENDANT:  I have been forced, however, to speak on my own behalf and my lawyer ain't doing it for me, man, I don't know what's going on in this courtroom, your Honor, but I finished facing some, you know, some facts and -- when it comes to evidence and what's been taking place so far and it just continues to be ignored by the [c]ourts and that's not fair, your Honor, especially when we talking about a trial, if at any point in time, you know, in the interest of fairness, you know, it's supposed to be now.  Like why is it still, why am I, in my rights, my [c]onstitutional [r]ights under the Sixth Amendment continue as far as ineffective counsel and the right to cross-examine the alleged victim in this case, continue to be ignored.

A-3764-22

THE COURT: Well, I've let you go on for over 10 minutes, [defendant]. Let the record reflect that the defendant has indicated that he has decided not to testify, that he's making this decision of his own free will. He's not been pressured or forced --

DEFENDANT: I never asked for my rights to be waived, your Honor. What's going on here?

THE COURT: -- to be making this decision.

DEFENDANT: Did my lawyer tell you that, for the record, because I never told him to do that. What is going on? This is what I'm asking you. What is going on? Please.

THE COURT: That being the case --

DEFENDANT: What is going on? How --

THE COURT: -- he chooses not to testify.

DEFENDANT: -- are you going to allow for the State to wrongfully convict me of this? Where is the person who supposedly got robbed, your Honor? Everybody came in here, but him. He's in my favor.

THE COURT: I let you talk for about 15 minutes, [defendant].

DEFENDANT: But I'm just trying to get an understanding, Judge. What is going on here? Is this for real?

THE COURT: Now you got to show me whether or not you're going to sit there quietly while I bring up the jury, because if you're disruptive again --

19

DEFENDANT:  Oh, God.

THE COURT:  -- as you have been --

DEFENDANT:  So this must not be on the record.

THE COURT:  -- since the beginning --

DEFENDANT:  This can't be on the record.

THE COURT:  -- I'm going to remove you from the courtroom again if you can't sit quietly.  Don't say I haven't warned you.  I have told you all along that your behavior dictates to me whether or not you want to be in the courtroom.  If you sit quietly, you can stay in the courtroom.  If you are disruptive, you're going to be taken out of the courtroom.  All right?

DEFENDANT:  So I don't have a right for these questions to be answered, your Honor?

THE COURT:  Anything further before we call for the jury?

DEFENDANT:  None of these questions, your Honor?

In a thirteen-page opinion accompanying the denial of PCR, the trial court found:  "Defendant was disruptive during pretrial and trial proceedings to such an extent that he had to be removed from the courtroom on several occasions"; "[a] defendant may not engage in continuous and severe courtroom misconduct and expect to be rewarded with" PCR, citing State v. Montgomery, 427 N.J. Super. 403 (App. Div. 2012); defendant "failed to specify what 'misadvi[c]e'

[the] attorney had provided or what 'trial preparation' (assuming he would have accepted same) should have been provided"; and "'[b]ald assertions' are insufficient to sustain a defendant's burden of establishing a prima facie ineffective assistance of counsel claim under the Strickland [v. Washington, 466 U.S. 668 (1984)] standard," citing State v. Cummings, 321 N.J. Super. 154, 170 (App. Div. 1999). The trial court found "[d]efendant ha[d] failed to establish a prima facie claim that his trial counsel was ineffective" and "[t]hus . . . PCR . . . [wa]s denied without a hearing."

On appeal, defendant raises the following argument for our consideration:

> [DEFENDANT] IS ENTITLED TO AN EVIDENTIARY HEARING ON HIS CLAIM THAT TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE BY MISADVISING HIM ABOUT HIS RIGHT TO TESTIFY.

Defendant contends he "made a prima facie claim that trial counsel rendered ineffective assistance by failing to prepare him and advise him adequately about testifying at his trial, thus causing him to forgo his right to testify." He asserts counsel "never explained to him how his testimony could be helpful or could be used to show the jury that he was not identified as the robber." Defendant acknowledges "he could not directly say that the victim failed to identify him, pursuant to the court's earlier ruling" but asserts "he could

21

say that there was a 'show up' where the victim viewed him, and then he was released from custody and no charges were filed." Defendant asserts these claims are specific and "not bald assertions."

Further, defendant contends the trial court's reliance on Montgomery was misplaced because "Montgomery held that a defendant cannot disrupt a trial and then demand a mistrial based on the disruption." However, here, defendant asserts his "actions are not relevant" as "he could have disrupted the trial and counsel could still be ineffective."

In addition, defendant argues that trial counsel "never stated that he discussed with [him] how he could testify regarding the show up, or about the tactical advantages or disadvantages of his testimony" as required by State v. Bogus, 223 N.J. Super. 409, 423 (App. Div. 1988).

We begin our discussion with a review of the principles governing our analysis. PCR "is New Jersey's analogue to the federal writ of habeas corpus." State v. Pierre, 223 N.J. 560, 576 (2015) (quoting State v. Preciose, 129 N.J. 451, 459 (1992)). It "provide[s] a built-in 'safeguard that ensures that a defendant [i]s not unjustly convicted.'" State v. Nash, 212 N.J. 518, 540 (2013) (quoting State v. McQuaid, 147 N.J. 464, 482 (1997)).

"A petition for [PCR] is cognizable if based upon . . . [a s]ubstantial denial in the conviction proceedings of defendant's rights under the Constitution of the United States or the Constitution or laws of the State of New Jersey." R. 3:22-2(a). "Those accused in criminal proceedings are guaranteed the right to counsel to assist in their defense." State v. Gideon, 244 N.J. 538, 549 (2021) (citing U.S. Const. amend. VI; N.J. Const. art. I, ¶ 10). "[I]t is not enough '[t]hat a person who happens to be a lawyer is present at trial alongside the accused,' . . . rather, the right to counsel has been interpreted by the United States Supreme Court and th[e New Jersey Supreme] Court as 'the right to the effective assistance of counsel.'" Id. at 550 (second alteration in original) (quoting Strickland, 466 U.S. at 685-86).

To establish a prima facie claim for ineffective assistance of counsel, a defendant must satisfy the two-prong test established in Strickland. "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Strickland, 466 U.S. at 687. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances,

23

the challenged action 'might be considered sound trial strategy.'" Id. at 689 (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)).

Under the second "far more difficult prong," a defendant must show that his or her defense was prejudiced. Gideon, 244 N.J. at 550 (quoting Preciose, 129 N.J. at 463). The defendant must demonstrate "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Strickland, 466 U.S. at 687. "Prejudice is not to be presumed." Gideon, 244 N.J. at 551 (quoting State v. Fritz, 105 N.J. 42, 52 (1987)). "The defendant must 'affirmatively prove prejudice.'" Ibid. (quoting Strickland, 466 U.S. at 693).

If defendant fails to "make[] both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." Strickland, 466 U.S. at 687.

"A petitioner must establish the right to [PCR] by a preponderance of the credible evidence." Preciose, 129 N.J. at 459 (citing State v. Mitchell, 126 N.J. 565, 579 (1992)). "R[ule] 3:22-1 does not require evidentiary hearings to be held on [PCR] petitions [and] R[ule] 3:22-10 recognizes judicial discretion to conduct such hearings." Cummings, 321 N.J. Super. at 170. Nevertheless, "trial courts ordinarily should grant evidentiary hearings to resolve ineffective-assistance-of-counsel claims if a defendant has presented a prima facie claim in

24

support of" PCR. Preciose, 129 N.J. at 462. "[C]ourts should view the facts in the light most favorable to a defendant to determine whether a defendant has established a prima facie claim." Id. at 462-63. "A prima facie case is established when a defendant demonstrates 'a reasonable likelihood that his or her claim, . . . will ultimately succeed on the merits.'" State v. Porter, 216 N.J. 343, 355 (2013) (quoting R. 3:22-10(b)). A defendant "must do more than make bald assertions that he was denied the effective assistance of counsel." Cummings, 321 N.J. Super. at 170. "Where, as here, the PCR court has not conducted an evidentiary hearing, we review its legal and factual determinations de novo." State v. Aburoumi, 464 N.J. Super. 326, 338 (App. Div. 2020).

"The right of a criminal defendant to testify on his or her own behalf 'is essential to our state-based concept of due process of law, which guarantees a fair and impartial trial in which there is a legitimate and decorous recognition of the substantive rights of the defendant.'" State v. Ball, 381 N.J. Super. 545, 556 (App. Div. 2005) (internal quotation marks omitted) (quoting State v. Savage, 120 N.J. 594, 628 (1990)). "[A] criminal defendant is entitled to testify on his or her own behalf under Article I, paragraphs 1 and 10 of our State Constitution." Ibid. (alteration in original) (quoting Savage, 120 N.J. at 628).

25

"As with any other constitutionally-based right, a defendant must knowingly waive the right." Ibid.

A defendant's decision

> in a criminal case as to whether or not to testify rests ultimately with defendant and is an important strategic or tactical decision to be made by a defendant with the advise of his counsel. It is the responsibility of a defendant's counsel . . . to advise defendant on whether or not to testify and to explain the tactical advantages and disadvantages of doing so or of not doing so.
>
> [Bogus, 223 N.J. Super. at 423.]

It is against this well-established law that we consider defendant's petition for PCR. We first consider whether trial "counsel's performance was deficient." Strickland, 466 U.S. at 687. Counsel stated he spoke with defendant regarding defendant's right to testify on the day prior and the morning of defendant's appearance. In addition, counsel said he explained to defendant that his prior convictions, albeit sanitized, would be admitted as evidence in the trial.

Defendant advised counsel he wanted to talk to the trial court. The trial court allowed defendant ample opportunity to speak, until it became clear defendant sought to relitigate decisions the court already rendered. The judge advised defendant regarding the ramifications of defendant's testifying. Defendant stated he did not want to testify, and no one forced him into that

26

decision. Under these circumstances, we conclude defendant failed to establish a prima facie claim that counsel's representation was inadequate.

In concluding defendant's claim fails under the first Strickland prong, he cannot satisfy his burden. See Strickland, 466 U.S. at 687 ("Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable."). Nevertheless, for the sake of completeness, we consider the second prong, whether defendant's defense was prejudiced. See ibid. We glean from defendant's argument that his defense was prejudiced because he would have testified "that there was a 'show up' where the victim viewed him, and then he was released from custody and no charges were filed."

However, absent from defendant's argument is the recognition that his prior convictions would have been admitted at trial. The prior convictions could have been used by the State to impeach defendant's credibility and would have been in addition to the "overwhelming evidence" of defendant's guilt presented at trial. Further, considering our prior opinion—that the MVR would not have led the jury to a different result—it is equally clear defendant's testimony would have been similarly unpersuasive. Therefore, we conclude defendant cannot establish a prima facie claim his defense was prejudiced by his failure to testify.

27

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

*M.C. Hasley*

Clerk of the Appellate Division

A-3764-22